Filed 1/23/12

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE, )
)
      Plaintiff and Respondent, )
)       S184665
      v. )
)       Ct.App. 5 F056605
EDUARDO MIL, JR., )
)       Kern County
      Defendant and Appellant. )   Super. Ct. No. BF11667B
_____)

A Kern County jury convicted defendant Eduardo Mil, Jr., of first degree murder and made true findings as to the burglary-murder and robbery-murder special circumstances. The jury was fully instructed as to the elements of the felony-murder special circumstances for a defendant who was the actual killer. However, the jury was not fully instructed as to the elements of the special circumstances for a defendant who was not the actual killer, including the requirement that a nonkiller, in the absence of a showing of intent to kill, must have acted with reckless indifference to human life and as a major participant in the commission of the underlying felony. (See Pen. Code, § 190.2, subd. (d); *People v. Estrada* (1995) 11 Cal.4th 568, 575.) The Court of Appeal determined the omission in the instructions was harmless and affirmed the judgment. We agree that the instructional error was amenable to harmless-error review, but find that the error here was prejudicial. We therefore reverse the jury's true findings on the special circumstances of burglary murder and robbery murder as well as

1

defendant's sentence of life imprisonment without the possibility of parole, and remand the matter for further proceedings.

**BACKGROUND**

Around 5:00 a.m. on October 24, 2006, Rolland Coe, 60, was found lying in the doorway of his room at the El Don Motel in Bakersfield. He had multiple stab wounds, which were inflicted by a knife with a blade between three and one-half and four and one-half inches, as well as bruising on his face, which could have been caused by blows from a fist. The knife wounds eventually proved fatal.

Coe had checked into room 11 of the motel the day before. He shared his motel room with Crystal Eyraud, a drug addict who was much younger. Defendant, 35, was Eyraud's boyfriend and a fellow addict. On October 22, defendant had an argument with Eyraud, started a commotion, and was asked to leave the motel. On October 23, he and Eyraud were talking calmly between 10:00 and 11:00 p.m., but the motel manager, Michael McLane, nonetheless told him to leave the premises. Before defendant left, he vowed to Eyraud that he was "going to rob" Coe.

On October 24, Carl Cowen, a convicted felon who was McLane's best friend and Eyraud's stepfather, saw defendant at the motel between midnight and 2:00 a.m. Defendant said he was looking for Eyraud and had heard she was with "a guy in Room 11." If that was true, he said to Cowen, he was "going to beat the hell out of the guy and rob him." Cowen, who was working at the motel doing odd jobs, told defendant to leave the premises. An hour later, Cowen saw defendant talking with Eyraud in front of room 11. Cowen again told defendant to leave. Half an hour later, defendant returned but was told yet again to leave. Defendant did so, but not before repeating his threats.

Around 5:00 a.m., while he was checking the grounds of the motel, Cowen came upon Coe, who was slumped and bleeding in the doorway of room 11.

2

Because Cowen had absconded from parole supervision, Cowen asked McLane to call 911 to report what Cowen had seen. Police found blood on the bed and carpet as well as on an ice chest in the middle of the room and a trail of blood leading into the bathroom. A knife with what appeared to be blood on it was recovered from a trash can about a block from the motel. The forensic pathologist who performed the autopsy on Coe testified that the knife could have caused Coe's injuries.

Neither defendant nor Eyraud testified. However, their statements to police, including a lengthy taped interview with defendant, were admitted into evidence.

During the taped interview on the evening of October 24, defendant denied any knowledge of Coe's death or even of any knife attack. He knew Eyraud was staying at the motel with "an older guy." Late on October 23 or early on October 24, Eyraud had asked him to steal a car "so she could take everything the guy had and go and sell it." She said she was going to give Coe some pills to put him to sleep and then take his "loot," and offered to give defendant some "dope" in exchange. Defendant did not want "to go through all that just to get a dime bag of fuckin' dope that's what she's going to end up giving me anyway," so he refused. They argued, and he left on his bicycle. Defendant denied going back to the motel. However, after being told that Eyraud had taken responsibility for the stabbing, defendant changed his story and gave the following account:

Defendant admitted he *did* return to the motel on October 24, and said that Eyraud let him into room 11. Coe was seated in a chair and started acting in a belligerent manner. Coe asked Eyraud, "[I]s this the guy? Is this the mother-fucker?" Coe started to stand up, and defendant punched him twice. Coe then jumped on defendant and pushed him down. Defendant got back up and hit Coe again, at which point Coe was screaming and yelling and "started going crazy" as

3

the men continued to fight.  Defendant told Eyraud they ought to leave; Coe yelled out to Eyraud, "What's wrong with you, Crystal?  What the fuck?"  The fight remained even, but defendant eventually escaped and left the motel on his bike.  As he ran out, he told Eyraud to run.  He said he saw her head towards Cowen's room.

Under further questioning, defendant claimed that Eyraud, during the struggle between defendant and Coe, had yelled at defendant, "Mother-fucker!  I told you this was going to happen!"  She then told defendant to "just let him go and get up," and (apparently in the same breath) to "[g]et his wallet!  Get his wallet!"  Coe interjected, "[Y]ou don't really have to do all of this for my wallet."  Defendant eventually admitted that he "[p]retty much" knew Eyraud was going to "roll" Coe, that he was jealous of her "selling ass for dope," and that he had wanted Eyraud to give him some of Coe's money.  (Eyraud had told him, during their initial conversation, that Coe had a couple of VCR's, some DVD's, and some cash, and that defendant should come back in an hour to get some money.)  He also knew Eyraud liked to carry "big old steak knives," but said he did not see any knives at the motel.  Defendant originally claimed that the cigarette police found on the bumper of Coe's van, which was parked in front of the motel room, was just a "smoke" he had asked her to get him, but then admitted that the cigarette was a signal that she had money to give him.  Coe was supposed to have been "knocked out" by pills and alcohol by the time defendant arrived.

Eyraud told police, in an interview a few hours after Coe's body was discovered, that she had stabbed Coe and then tossed the knife in a trash can as she ran from the scene.  She told her mother the same thing.  According to Eyraud, she had tried to separate defendant and Coe during the fight but was kicked by Coe in the stomach.  Worried that Coe might have thereby caused risk to her pregnancy, Eyraud reached for a knife (which she had earlier stolen from Coe) and stabbed

4

him with it.  Eyraud thought she had stabbed Coe only once.  She said that the robbery was defendant's idea and that she had been instructed to leave the cigarette on the bumper of the van as a signal for defendant to return.

In an interview with police a couple of days later, Eyraud said she had "flipped out" before stabbing Coe.  When asked why she had grabbed the knife in the first place, she said she did so "to stop whatever was happening from happening."  She said that defendant ran out of the room first.  She did not know how many times she stabbed Coe, nor did she know where she had stabbed him.  Eyraud told police, "I'm looking at a lot of time for what I did and I really don't care."

Yet another account of the murder was offered through the testimony of Cowen, who was transported by bus from the jail to court with defendant, Eyraud, and Raquel Rodriquez on January 17, 2007.  Cowen said he was two seats behind defendant and overheard defendant talking to Eyraud through the wire mesh separating the men and women.  According to Cowen, defendant told Eyraud to "take the rap" for the stabbing because she was "retarded" and "could get away with this," in that she would be sent to an institution for less than a year while he would face life in prison.  During this conversation with Eyraud, defendant recited details of the crime:  he said he beat up Coe until Coe lost consciousness, then stabbed Coe several times to cover up their tracks.  On the way off the bus, Cowen told defendant, who had appeared unaware of Cowen's presence until that moment, that he was "a piece of crap."  Defendant replied that the best thing for Cowen was to stay out of it, and added a warning that he had friends who could "take care of" Cowen "on the streets or inside."

Rodriquez told police, in an interview on June 19, 2008, that she too had overheard the conversation on the bus.  According to Rodriquez, defendant said that he had "gone crazy" because he thought Eyraud was being unfaithful and that

5

he had "stuck [Coe] and kept sticking him and couldn't stop."  Rodriquez, who had expressed concern to police about testifying in court and then claimed at trial to have no recollection of the content of the conversation on the bus, also told police that defendant had threatened to kill Cowen if he did not keep quiet.

Defendant was convicted of first degree murder with robbery-murder and burglary-murder special circumstances.  (Pen. Code, §§ 187, subd. (a), 190.2, subd. (a)(17)(A), (G)).  The court found two prior prison term allegations true (Pen. Code, § 667.5, subd. (b)) and sentenced defendant to life in prison without the possibility of parole, enhanced by two years.  In a separate proceeding prior to defendant's trial, Eyraud pleaded no contest to voluntary manslaughter.

The Court of Appeal affirmed.  The Court of Appeal determined that the jury, in accordance with the prosecution's argument, must have convicted defendant as an aider and abettor and not as the actual killer.  The appellate court acknowledged that the trial court erred in failing to instruct the jury to determine whether defendant, as a nonkiller, was a major participant in the burglary and robbery and acted with reckless indifference to human life, but found the error to be harmless in light of the overwhelming evidence on those elements.

## DISCUSSION

In *People v. Anderson* (1987) 43 Cal.3d 1104, this court determined that the felony-murder special circumstance, as it then read, applied only to the actual killer or to an aider and abettor who intended to kill.  (*Id*. at p. 1147.)  In 1990, the voters approved Proposition 115, which expanded the scope of Penal Code section 190.2 by adding subdivisions (c) and (d).  Accordingly, a person other than the actual killer is now subject to the death penalty or life imprisonment without the possibility of parole if that person intended to kill *or* was a major participant in the underlying felony and acted with reckless indifference to human life.  (*People v. Estrada*, *supra*, 11 Cal.4th at p. 575.)

6

The jury here was instructed that the felony-murder special circumstances applied only if defendant was guilty of first degree murder, that the People had the burden of proving the truth of the special circumstances beyond a reasonable doubt, and that the jury must agree unanimously. The jury was also told the special circumstances required proof that "the murder was committed while the defendant was engaged in the commission or attempted commission of a robbery or a burglary." However, the jury was *not* instructed that a nonkiller, under the felony-murder special-circumstance allegations, must (1) have personally had the intent to kill or (2) have been a major participant in the commission of the burglary or robbery and have acted with reckless indifference to human life.

The Court of Appeal found it "clear" the trial court erred in omitting those elements from the jury instructions, and we agree. A trial court has a sua sponte duty to instruct the jury on the essential elements of a special circumstance allegation (*People v. Prieto* (2003) 30 Cal.4th 226, 256-257) as well as the elements of a charged offense (*People v. Flood* (1998) 18 Cal.4th 470, 504-505 (*Flood*)). Despite the Attorney General's contention that defendant forfeited this claim by failing to object to the instructions given, it is well settled that no objection is required to preserve a claim for appellate review that the jury instructions omitted an essential element of the charge. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503; *Flood*, *supra*, 18 Cal.4th at p. 482, fn. 7; Pen. Code, § 1259.) We therefore consider whether the error is amenable to harmless-error analysis or is instead reversible per se.

### A

"We have consistently held that when a trial court fails to instruct the jury on an element of a special circumstance allegation, the prejudicial effect of the error must be measured under the test set forth in *Chapman v. California* (1967) 386 U.S. 18, 24." (*People v. Williams* (1997) 16 Cal.4th 635, 689.) The high

7

court similarly has applied the *Chapman* test where the jury instructions have omitted an essential element of the charged offense. (*Neder v. United States* (1999) 527 U.S. 1, 4 (*Neder*).) Defendant acknowledges this authority but contends that harmlessness can be assessed only when a single element has been omitted. He contends that the omission here, which involved more than one element, is structural error and thus cannot be cured by a subsequent finding that no prejudice actually occurred.

Defendant is correct that *Neder* and several of the other cases cited by the parties involved the omission of only one element. He is mistaken, though, in characterizing those cases as suggesting that the omission of more than one element is necessarily structural error.

The high court has "repeatedly recognized that the commission of a constitutional error at trial alone does not entitle a defendant to automatic reversal." (*Washington v. Recuenco* (2006) 548 U.S. 212, 218.) An error is " 'structural,' and thus subject to automatic reversal, only in a 'very limited class of cases,' " such as the complete denial of counsel, a biased decisionmaker, racial discrimination in jury selection, denial of self-representation at trial, denial of a public trial, and a defective reasonable-doubt instruction. (*Neder*, *supra*, 527 U.S. at p. 8.) What unites this class of errors is "a 'defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.'. . . Put another way, these errors deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair.' " (*Id.* at pp. 8-9.)

If, on the other hand, " 'the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis.' " (*Neder*,

8

*supra*, 527 U.S. at p. 8.) "[W]hile there are some errors to which *Chapman* does not apply, they are the exception and not the rule." (*Rose v. Clark* (1986) 478 U.S. 570, 578.) Accordingly, " 'most constitutional errors can be harmless.' " (*Neder*, *supra*, at p. 8.) For example, the omission of an element of a charged offense or sentencing factor is harmless when "the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error." (*Neder*, *supra*, at p. 17; see also *Washington v. Recuenco*, *supra*, 548 U.S. at p. 220.)

In this case, defendant complains that the jury should have been (but was not) instructed to determine the existence or nonexistence of *two* elements of the felony-murder special-circumstance allegations: (1) whether he was a major participant in the underlying felony, and (2) whether he acted with reckless indifference to human life at the time of his participation. If omission of either of these elements could be harmless when considered in isolation, does the error necessarily become structural, and thus reversible per se, when both elements are omitted?

In our view, the omission of two elements from the jury charge "differs markedly" from the constitutional violations that have been found to defy harmless-error review. (*Neder*, *supra*, 527 U.S. at p. 8.) The latter class of errors " 'infect the entire trial process,' [citation], and 'necessarily render a trial fundamentally unfair.' " (*Ibid.*) But an instruction that omits two elements of an offense or special circumstance allegation, like an instruction that omits only one element, "does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." (*Id*. at p. 9.) Where an instruction omits some elements of the offense or allegation, but the elements were uncontested and supported by overwhelming evidence, it would not necessarily

9

follow that the trial was fundamentally unfair or an unreliable vehicle for determining guilt or innocence.

Defendant is correct that the omission of two or more elements from an instruction would prevent the jury "from rendering a 'complete verdict' on *every* element of the offense" (*Neder*, *supra*, 527 U.S. at p. 11) and thus violates the accused's Sixth Amendment right to a jury as well as the "inviolate right" to a jury under the California Constitution (Cal. Const., art. I, § 16). But the incursion on the right to a jury trial occurs whether the instruction omits one element *or* multiple elements of the offense, yet both the high court and this court have already held that the omission of *an* element of the offense is amenable to harmless-error analysis. (*Neder*, *supra*, 527 U.S. at p. 13; *Flood*, *supra*, 18 Cal.4th at p. 490.) Plainly, not every violation of the state and federal right to a jury trial is a structural defect requiring reversal without regard to whether the defendant suffered actual prejudice.

The closest analogue for defendant's claim that instructional error affecting more than one element requires automatic reversal is *Sullivan v. Louisiana* (1993) 508 U.S. 275, but that case does not go as far as he would like. In *Sullivan*, the trial court gave the jury a defective reasonable-doubt instruction in violation of the defendant's Fifth and Sixth Amendment rights to have the charged offense proved beyond a reasonable doubt. The high court concluded that the error was not amenable to harmless-error review because an erroneous reasonable-doubt instruction "vitiates *all* the jury's findings" (*id*. at p. 281) and produces "consequences that are necessarily unquantifiable and indeterminate" (*id*. at p. 282). By contrast, an instruction that omitted some—but not all—of the elements of an offense or special-circumstance allegation would prevent a jury finding on the affected elements but would not necessarily vitiate *all* the jury's findings. (See *Neder*, *supra*, 527 U.S. at p. 11; accord, *Flood*, *supra*, 18 Cal.4th at

10

p. 503 [distinguishing *Sullivan* on the ground the defective instruction "undermined each and every finding underlying the guilty verdict"].)

Defendant points out, correctly, that the historical right to trial by jury in serious criminal cases " 'was designed to guard against a spirit of oppression and tyranny on the part of rulers,' and 'was from very early times insisted on by our ancestors in the parent country, as the great bulwark of their civil and political liberties.' " (*Neder*, *supra*, 527 U.S. at p. 19.)  Yet in *Neder*, the high court found that affirming the judgment when an omitted element is supported by uncontroverted evidence "reaches an appropriate balance between 'society's interest in punishing the guilty [and] the method by which decisions of guilt are made.' " (*Id*. at p. 18.)  Defendant fails to persuade us that allowing a reviewing court to inquire whether the jury verdict would have been the same absent the error undermines the stated purposes of the jury trial guarantee where, for example, a defendant did not, and apparently could not, bring forth facts contesting either of *two* omitted elements.

Defendant argues next that an inquiry into the existence of prejudice would pose "unmanageable" difficulties when more than one element has been omitted because of "a multiplication of variables," such as determining whether the evidence was solid and uncontested "on each omitted element," whether the defense might have been prevented from introducing evidence on each of the omitted elements, or whether there was a relationship between the omitted elements.  We do not perceive these inquiries to be any more onerous than when a reviewing court assesses the effect of evidence admitted in violation of the Fifth Amendment privilege against self-incrimination or the effect of evidence excluded in violation of the Sixth Amendment right to confront witnesses.  Neither effect is "readily calculable," yet both are amenable to harmless-error analysis.  (*Neder*, *supra*, 527 U.S. at p. 18.)  Even if particular circumstances can be imagined in

11

which the inquiry would present unusual complexities, the high court has traditionally approached "the structural-error determination (*i.e.*, whether an error is structural)" categorically and not case by case. (*Id*. at p. 14.) Given the strict standard that harmlessness be established beyond a reasonable doubt, the peculiar difficulty of analyzing prejudice in an individual case would in any event redound to the benefit of the defendant. Although it may prove more difficult, as a practical matter, to establish harmlessness in the context of multiple omissions, that is not a justification for a categorical rule forbidding an inquiry into prejudice. "*Neder* makes clear that harmless-error analysis applies to instructional errors so long as the error at issue does not categorically ' "vitiat[e] *all* the jury's findings." ' " (*Hedgpeth v. Pulido* (2008) 555 U.S. 57, 61 (per curiam).)

Perhaps the most persuasive response to defendant's contention that the harmless-error inquiry must be limited to the omission of a single element is the utter artificiality of the line he purports to draw. True it is, as defendant claims, that " '[o]ne' is discernable as a discrete integer," and that a rule limited to one omitted element would relieve courts of the task of determining how many omitted elements is too many. Unfortunately, defining an "element" of an offense is more of an art than a science, inasmuch as an element can, without reference to objective or standardized criteria, be further subdivided into separate elements or, alternatively, integrated with other aspects into a single element. (See *Holloway v. McElroy* (5th Cir. 1980) 632 F.2d 605, 627, fn. 35.) For example, second degree implied-malice murder has been defined variously in this state as having three *or* four elements (compare CALJIC No. 8.31 with CALCRIM No. 520), and aggravated assault can range from two to five elements (compare CALJIC No. 9.02 with CALCRIM No. 875). Which would be the "correct" number of elements under defendant's proposed one-element limitation? Some crimes, moreover, incorporate, as one element, all of the elements of *another* crime. (See

12

*People v. Magee* (2003) 107 Cal.App.4th 188, 192-193 [because "the commission of a felony is an element" of being an accessory after the fact, the jury must be instructed "with the elements of the underlying felony"].)  Would the omission of an instruction defining the underlying felony count as one element or multiple elements?  (Cf. *Kolberg v. State* (Miss. 2002) 829 So.2d 29, 45-52 [failure to instruct on any of the elements of the felony underlying the finding of felony capital murder was harmless].)  And different jurisdictions routinely "subdivide and number the elements differently," even though "the required proof is ultimately the same."  (*Sioux Biochemical, Inc. v. Cargill, Inc.* (N.D. Iowa 2005) 410 F.Supp.2d 785, 795.)  Inasmuch as there is no requirement that a court "specifically label each element as 'an element' " (*Com. v. Natividad* (Pa. 2007) 938 A.2d 310, 326, fn. 10), nor a requirement that the elements be enumerated in any particular way, as long as the necessary elements are included (*U.S. v. Russell* (10th Cir. 1997) 109 F.3d 1503, 1513), we conclude that defendant's proposed limitation is simply unworkable.

To be sure, the federal Constitution bars a court from directing a verdict for the prosecution in a criminal trial by jury.  (*Rose v. Clark*, *supra*, 478 U.S. at p. 578.)  And our own case law has held that the omission of "substantially all of the elements" of a charged offense is reversible per se.  (*People v. Cummings* (1993) 4 Cal.4th 1233, 1315 (*Cummings*).)  But these limitations derive not from an arbitrary counting game, but from the effect of the omission on the function and importance of the jury trial guarantee.  Here, as in *Flood*, we do not foreclose the possibility that "there may be some instances in which a trial court's instruction removing *an* issue from the jury's consideration will be the equivalent of failing to submit the entire case to the jury—an error that clearly would be a 'structural' rather than a 'trial' error."  (*Flood*, *supra*, 18 Cal.4th at p. 503, italics added.)  The critical inquiry, in our view, is not the *number* of omitted elements but the *nature*

13

of the issues removed from the jury's consideration.  Where the effect of the omission can be "quantitatively assessed" in the context of the entire record (and does not otherwise qualify as structural error), the failure to instruct on one or more elements is mere " 'trial error' " and thus amenable to harmless-error review. (*Arizona v. Fulminante* (1991) 499 U.S. 279, 307-308.)

Defendant warns that such a rule will encourage other incursions on the right to a jury trial and erode the incentive to instruct with due care, but it is hard to see why that would be so.  An instructional error involving multiple elements, like an error involving a single element, will be deemed harmless only in unusual circumstances, such as where each element was undisputed, the defense was not prevented from contesting any of the omitted elements, and overwhelming evidence supports the omitted element.  The possibility that this set of circumstances might occasionally exist is unlikely to affect the practices of attorneys or courts in the general run of criminal trials, which, after all, are conducted to resolve *contested* issues of fact underlying the elements of a crime. On the other hand, holding the error harmless under these circumstances "does not 'reflect a denigration of the constitutional rights involved' "; rather, "it 'serve[s] a very useful purpose insofar as [it] block[s] setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial.' " (*Neder*, *supra*, 527 U.S. at p. 19.)

Our approach is consistent with that of the other post-*Neder* courts to have analyzed instructional error affecting more than one element of a charged offense. In *State v. Peteja* (Idaho Ct.App. 2003) 83 P.3d 781, for example, the jury instructions omitted two elements of the felony offense of destruction of evidence. (*Id*. at p. 786.)  The Idaho court relied, as we do here, on *Neder*'s observation that structural errors, which " 'infect the entire trial process,' " "occur only in a limited class of cases," as well as on *Neder*'s distinction between a flawed reasonable-

14

doubt instruction, which " 'vitiates *all* the jury's findings,' " and "the consequences of an instruction omitting or misstating an element[, which] are limited to the jury's finding on that element." (*Peteja*, *supra*, 83 P.3d at p. 787.) Because the evidence on the omitted elements was undisputed and bolstered by the defendant's own testimony, the court found the instruction's omission of those two elements to be harmless. (*Id*. at p. 788; accord, *Scoggin v. Kaiser* (10th Cir. 1999) 186 F.3d 1203, 1207 [misstatement or omission of two elements of grand larceny "is subject to harmless error review"]; *Wilson-Bey v. U.S.* (D.C. 2006) 903 A.2d 818, 843-847 [omission of the elements of premeditation and deliberation and specific intent to kill for first degree murder is amenable to harmless-error analysis, although the error was prejudicial as to one of the two defendants]; *Rosen v. State* (Fla.Dist.Ct.App. 2006) 940 So.2d 1155, 1161-1163 [failure to require the jury to find two elements of first degree felony molestation, i.e., that the defendant was over 18 and the victim was under 12, was harmless]; *State v. Ouellette* (Minn.Ct.App. 2007) 740 N.W.2d 355, 360 [omission of two elements of the charge of refusing to submit to a chemical test was harmless beyond a reasonable doubt].)

Finally, we conclude that the state Constitution affords no greater protection than the federal Constitution in these circumstances. As we stated in *Cummings*, *supra*, 4 Cal.4th at page 1312, footnote 54, "Error in omitting an element of an offense in jury instructions is subject to harmless error analysis when considering the defendant's state constitutional due process right to have the jury determine every material issue presented by the evidence." This rule applies even when multiple elements have been omitted. In *People v. Odle* (1988) 45 Cal.3d 386, we analyzed the trial court's failure to instruct the jury on *any* of the elements of the special circumstance of intentionally killing a peace officer in the line of duty. We found the error harmless under the California Constitution in that

15

"the first two elements of the special circumstance—that [the decedent] was a peace officer engaged in the performance of his duty—were expressly stipulated to by defense counsel"; "the jury expressly found the third element, intentional killing, in the course of its other findings"; and the omission of "the last element— that defendant 'knew or reasonably should have known that his victim was a peace officer engaged in the performance of his duties'—was harmless" because "the circumstances of the murder make it impossible to conclude that such an assumed lack of knowledge would have been reasonable." (*Id*. at pp. 415-416.)

**B**

As explained above, the omission of one or more elements of a charged offense or special circumstance allegation is amenable to review for harmless error under the state and federal Constitutions, at least as long as the omission "neither wholly withdrew from jury consideration substantially all of the elements . . . , nor so vitiated all of the jury's findings as to effectively deny defendant[] a jury trial altogether." (*People v. Wims* (1995) 10 Cal.4th 293, 312, fn. omitted.) Defendant contends that the omission of two elements from the instructions concerning the felony-murder special-circumstance allegations—i.e., that defendant was a major participant in the underlying felony, and that at the time he participated in the underlying felony, he acted with reckless indifference to human life—was equivalent to the omission of "substantially all of the elements of an offense," as occurred in *Cummings*, *supra*, 4 Cal.4th at page 1315.

In *Cummings*, the trial court's instructions failed to define robbery, which was the subject of several of the charges against the codefendant, Kenneth Earl Gay. Except for a separate instruction informing the jury that " 'robbery requires [] the specific intent to permanently deprive the owner of its property' " (*Cummings*, *supra*, 4 Cal.4th at p. 1312, fn. 52), the jury was never informed of the elements of that crime or, in particular, instructed that "to convict, it must find

16

that personal property was taken from the robbery victims against their will by means of force or fear." (*Id.* at p. 1312.)

We do not find that the omission here was akin to what occurred in *Cummings*. (*Flood*, *supra*, 18 Cal.4th at pp. 503-504.) In this case, as in the cases from other jurisdictions cited above (see pp. 14-15, *ante*), the instructions omitted only two elements from the charge. Despite the error, the jury was instructed to find, and did find, that a burglary and a robbery were committed or attempted, that defendant aided and abetted the robbery and burglary with the requisite intent, that defendant formed the intent at the appropriate time, that there was a causal and temporal relationship between those felonies and the murder of Rolland Coe, and that the murder was committed while the defendant was engaged in the commission or attempted commission of a robbery and burglary. That defendant was a major participant in the robbery and burglary and that he acted with reckless indifference to human life while participating in those felonies are certainly important factors distinguishing special circumstance felony murder from first degree felony murder, but the failure to instruct on those elements did not necessarily render the trial unfair or prevent the trial from reliably serving its function as the means for determining defendant's guilt or innocence, given that the jury, under concededly correct instructions, made several essential findings concerning the existence of, and defendant's participation in, the burglary, robbery, and murder—as evidenced by defendant's conviction for first degree felony murder. The fact that several of those findings were *also* a prerequisite to a finding of special circumstance felony murder can only bolster one's confidence that the instructional omissions here did not remove substantially all of the elements of the special circumstance and thus could not have been inherently fatal. (See *People v. Odle*, *supra*, 45 Cal.3d at p. 415; see generally *Washington v. Recuenco*, *supra*, 548 U.S. at pp. 221-222.)

17

Moreover, the instructional error did not prevent defendant from offering evidence concerning the extent of his participation in the burglary and robbery or his state of mind.  (Cf. *People v. Sandoval* (2007) 41 Cal.4th 825, 839 [the defendant "did not necessarily have reason—or the opportunity—during trial to challenge the evidence supporting these aggravating circumstances"].)  "Accordingly, the error did not affect the content of the record and does not impair our ability to evaluate the error in light of the record."  (*Flood*, *supra*, 18 Cal.4th at p. 503.)

In sum, the omission of two elements from the felony-murder special circumstances was surely error, but it was not one of the "rare cases" where the error can be deemed structural.  (*Washington v. Recuenco*, *supra*, 548 U.S. at p. 218.)

## C

Having decided that the trial court's instructional error is amenable to harmless error analysis, we proceed to consider whether it appears beyond a reasonable doubt that the error did not contribute to the jury's verdict.

*Neder* instructs us to "conduct a thorough examination of the record.  If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding—it should not find the error harmless."  (*Neder*, *supra*, 527 U.S. at p. 19.)  On the other hand, instructional error is harmless "where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence."  (*Id*. at p. 17; accord, *People v. French* (2008) 43 Cal.4th 36, 53.)  Our task, then, is to determine "whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element."  (*Neder*, *supra*, at p. 19;

18

accord, *People v. Sandoval*, *supra*, 41 Cal.4th at p. 838.) Because we find that defendant contested whether he acted with reckless indifference to human life and that the record supports a reasonable doubt as to that element, we reverse the burglary and robbery special circumstances.

"[T]he culpable mental state of 'reckless indifference to life' is one in which the defendant 'knowingly engag[es] in criminal activities known to carry a grave risk of death.' " (*People v. Estrada*, *supra*, 11 Cal.4th at p. 577.) This mental state thus requires the defendant be "*subjectively* aware that his or her participation in the felony involved a grave risk of death." (*Ibid*., italics added.)

The Court of Appeal asserted that "[t]he conclusion that [defendant] acted with reckless indifference to human life . . . is beyond doubt," but its analysis of the prejudicial effect of the instructional error suggests that it may have relied instead on the less demanding standard of whether that finding was supported by substantial evidence. The Court of Appeal's discussion focused exclusively on evidence that was favorable to the verdict: that defendant entered the small motel room in the middle of the night "without the consent of the resident"; that he "engaged in a violent attack on . . . an older and smaller man"; that the verdict itself rebutted the defense contention that he fought with Coe only in self-defense; that he "left the motel room along with Eyraud knowing that Coe was down and in need of assistance"; that he knew Eyraud "liked to carry 'big old steak knives with her' "; and that he was not "surprised" to hear that Eyraud had stabbed Coe. Although we agree that this evidence would be sufficient to sustain a finding of reckless indifference on appellate review, under which we would view the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of any facts the jury might reasonably infer from the evidence (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1019), our task in analyzing

19

the prejudice from the instructional error is whether any rational factfinder could have come to the *opposite* conclusion.

Viewed under this standard, the Court of Appeal's analysis immediately begins to unravel. Although defendant may not have secured *Coe's* consent to enter the motel room, he was invited to enter by Crystal Eyraud, who was (according to Coe) sharing the room. And although the record may have supported the inference that defendant fled the motel room with Eyraud and therefore must have known about the stabbing, there was also evidence that defendant left the room before Eyraud. In addition to Eyraud, who told Sergeant Adam Plugge that defendant was the first one out of the room, defendant told police that he fled the room ahead of Eyraud, who had stopped to pick up something from the floor or bed. Defendant said, "Watch out Crystal, man, move, move, move," got on his bike, and "took off flying." He said he did not know what she picked up, but he did turn back and see her run towards her stepfather's room.

Moreover, according to defendant's statements to police, he did not plan a robbery, he did not expect to use any force, he was unaware that Eyraud had a knife with her in the room, and he did not know that Coe had been stabbed. Defendant told police that Eyraud had planned to "roll" Coe with the assistance of another woman at the motel. Eyraud said she would signal defendant in about an hour that she had secured the money by placing a cigarette on the bumper of Coe's van. Eyraud also said that Coe would be "knocked out" from "a pill" and alcohol by the time defendant arrived.

The cigarette was propped up against the hood ornament, but Coe was not unconscious when defendant returned. Indeed, as soon as Eyraud invited defendant into the room, Coe got up from a chair and demanded to know, in a belligerent tone, "[I]s this the guy? Is this the mother-fucker?" Afraid that Coe

20

was reaching for a bottle, defendant punched him twice. Coe yelled at Eyraud, jumped on defendant, and pushed him down. Defendant got back up and punched Coe again. Defendant also told Eyraud, "Let's leave. Let's go. Let's get the fuck out of here." Defendant and Coe continued to fight; the fight was "about even." Defendant tried to get up, but Coe would not let him go. Eyraud urged defendant to take Coe's wallet, but defendant never got it. Coe managed to push defendant away, forcing him to stumble into the wall. It appeared to defendant that Eyraud went back to the bed and was attempting to collect "all she could" of Coe's property. Defendant got up, pushed her out of the way, and ran out of the room. If Coe was stabbed, "that's when it [would] have been," but defendant said he had "tunnel vision, just get the fuck out of the way, I've gotta go." At the end of the police interview, defendant suggested Eyraud's stepfather (or Eyraud herself) had the time to walk back to the room, after defendant fled, to stab Coe. As defendant put it, "I just, uh, I don't think she did it."

In sum, the record could have supported a finding that defendant used only his fists, that he did not use deadly force (*People v. Munn* (1884) 65 Cal. 211, 213), and that the blows did not appear to "do much" to Coe other than to leave him "a little dazed." Despite the disparity in size and age, the fight between Coe and defendant remained "about even," and the People do not even claim that any of defendant's blows caused or hastened Coe's death. The record could also have supported a finding, based on defendant's statements to police, that defendant was unaware that Eyraud planned to use any force, that she was armed with a knife, or that she stabbed Coe. Under these circumstances, a rational juror, given proper instructions, could have had a reasonable doubt whether defendant was subjectively aware of a grave risk of death when he participated in this burglary and robbery. It follows, therefore, that omission of the element concerning defendant's state of mind was prejudicial and requires reversal of the burglary-

21

murder and robbery-murder special circumstances. (*People v. Williams*, *supra*, 16 Cal.4th at pp. 689-690.)

## DISPOSITION

The judgment of the Court of Appeal is reversed to the extent it affirmed the jury's true findings on the special circumstances of murder in the commission of a robbery and burglary (Pen. Code, § 190.2, subd. (a)(17)(A) & (G)) and the sentence of life imprisonment without the possibility of parole, and is otherwise affirmed. The matter is remanded to the Court of Appeal with directions to remand to the trial court for resentencing or retrial on the issue of the special circumstances at the option of the prosecuting attorney. (See *People v. Roy* (1989) 207 Cal.App.3d 642, 656.)

BAXTER, J.

**WE CONCUR:**

CANTIL-SAKAUYE, C.J.
KENNARD, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Mil

_____

**Unpublished Opinion** XXX NP opn. filed 6/17/10 – 5th Dist.
**Original Appeal**
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S184665
**Date Filed:** January 23, 2012

_____

**Court:** Superior
**County:** Kern
**Judge:** Kenneth C. Twisselman II

_____

**Counsel:**

Mark L. Christiansen, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Peter A. Smith, Janet A. Neeley, Charles A French and Craig S. Meyers, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Mark L. Christiansen
Law Office of Mark L. Christiansen
44489 Town Center Way, #D
Palm Desert, CA  92260
(760) 568-1664

Craig S. Meyers
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 324-5280