Filed 11/19/13  P. v. Hill CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>TYRELL HILL,<br><br>      Defendant and Appellant. | A135250<br><br>(Alameda County<br>Super. Ct. No. 164489A) |

Defendant was found guilty by jury trial of first degree murder (Pen. Code, § 187);[1] special circumstances allegations that the murder occurred during the commission of attempted robbery and burglary or attempted burglary (§ 190.2, subd. (a)(17)(A) & (G)) were found true.  He was sentenced to life imprisonment without the possibility of parole.[2]  Defendant raises two issues on appeal:  (1) that the trial court erred in admitting his statement to the police, as it was involuntary; and (2) that the trial court committed reversible error in failing to instruct upon the required elements for felony murder special circumstances if the jury determined that defendant was not the actual

---

[1] All further statutory references are to the Penal Code.

[2] The jury also found true an allegation that defendant personally used a firearm (§ 12022.5, subd. (a)) and an allegation that he intentionally discharged it (§ 12022.53, subd. (b)); it found not true an allegation that he discharged a firearm causing great bodily injury (as defined in § 12022.7, subd. (a)) or death (§ 12022.53, subd. (d)). Defendant pleaded no contest to two counts of being a felon in possession of a firearm (§ 12021, subd. (a)(1)), and admitted an alleged prior prison conviction, before the commencement of his jury trial.

1

killer (those elements being that he either had the intent to kill, or that he was a major participant in the underlying felony and acted with reckless indifference to human life). The trial court's determination that defendant's statement was voluntary was not error. While we accept the concession of the Attorney General that the trial court erred in omitting the referenced elements of the felony murder special circumstances from its instructions to the jury, we find the error to be harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).)  Accordingly, we affirm.

## I. Background

Kenneth Holowatch and Stephanie Bogue grew medical marijuana in their home in West Oakland, for distribution to medical marijuana dispensaries. Defendant learned of the grow operation and on June 12, 2009, he and Albert "Beeker" Tisdale and two other accomplices decided to rob the growers of their marijuana.

Around 1:00 p.m., the robbers went to the victims' home in defendant's van. They knocked on the door and asked for "Christie," insisting that she owed them money. Bogue indicated through a closed door that no one by that name lived there; the robbers left. Since the home had been burglarized a few weeks earlier, Bogue was concerned about the incident. She tried to call the police several times, but had difficulty getting through. The robbers retrieved a submachine gun from a nearby car. They then returned to the victims' home. Three robbers got out, while the driver stayed in the van. One robber stayed in front of the victims' home with the submachine gun, defendant went to the side of the home, and a third robber who was armed with a rifle went to the rear of the house. Someone kicked in the door to a laundry room at the rear of the house, but that did not lead to the interior of the home.

Holowatch and Bogue were huddled in the kitchen when defendant broke a window and pushed a handgun through the blinds. He yelled at the victims, stating, "We're serious." Bogue told defendant that they could have anything they wanted, just not to hurt them, and indicated they had no money. The victims then panicked and fled the home. In the front yard they were confronted by the man with the submachine gun. Holowatch struggled with the man over the submachine gun, while telling Bogue to run.

2

Bogue started to run, but came back to help Holowatch fight for the weapon. As the struggle for the submachine gun continued, defendant came around from the side of the house and fired his handgun at Holowatch. The man with the submachine gun was then able to shoot Holowatch.[3] Bogue dropped to the ground and covered her head as more rounds were fired. She heard the sound of the robbers running past her.

Two neighbors observed part of the confrontation in front of the victims' home. One saw a struggle and two men with long guns; she then heard shots. The other heard gunshots, looked out her window and saw one man running from the scene holding a long gun (not the submachine gun) and another running from the scene holding a pistol.

The police responded to the scene and found Holowatch dead in front of the house. His cause of death was later determined to be multiple gunshot wounds and blunt force head trauma. The laundry room door had been kicked in and the side window was broken. Six spent 9 millimeter shell casings were found on or near the walkway leading to the victims' house, as well as one live round and two spent slugs. Once the submachine gun was recovered, it was ascertained that it was fully automatic and fired 9 millimeter rounds. It was later determined that the six shell casings were fired by the submachine gun; the two slugs were fired from a different weapon, either from a 9 millimeter or .38 caliber firearm.

On July 29, 2009, the police received a tip regarding the location of the submachine gun that was used in the attempted robbery and shooting. As a result, they staked out defendant's home and observed defendant and Tisdale meet up with an individual named Jamaine Barnes. A search warrant was later executed at Barnes' residences and the submachine gun was located.

Barnes had been in custody the day of the shooting. He told police that he met with defendant on July 12, the day after he was released from jail. Defendant told him about the shooting, indicating that he and Tisdale picked up the submachine gun from

---

[3] The bullet fragments recovered from the victim during the autopsy included a bullet jacket that, according to the ballistics expert, could have been fired from the submachine gun.

Barnes' apartment because they wanted to use it in a robbery. Defendant and three others drove defendant's van to a house, looking for drugs. The homeowner came out of the house, grabbed the barrel of the submachine gun and struggled for control of the weapon. Defendant told Barnes, "Bra, we had to pop the nigga." From defendant's description of the attempted robbery and shooting, Barnes understood that defendant was the one holding the submachine gun.[4]

Defendant and Tisdale were subsequently arrested and defendant gave a statement to police officer Sergeant Phillips, wherein he admitted involvement in the attempted robbery, but sought to minimize his participation. He admitted that they were going to rob the homeowners of their marijuana and that they retrieved the submachine gun, which had been taken from Barnes' apartment, from a nearby car. While defendant admitted that he broke the side window of the home to gain entry, he said that he did so with a pipe and that he did not have a gun. He heard shooting while he was still on the side of the house; he fled from the scene, running past the crowd in front of the house. He denied being involved in the shooting. A search of the house where defendant and Tisdale lived revealed an assault rifle, a handgun, marijuana, and ammunition. A loaded semi-automatic handgun was found in a bedroom with defendant's wallet; an assault rifle and a fake gun were located in a downstairs bedroom.

Defendant was charged with murder, including special circumstances allegations that he committed the murder while engaged in a burglary and a robbery, with enhancements for personal use of a firearm, intentionally discharging a firearm, and discharging a firearm causing great bodily injury or death, and two counts of felon in possession of a firearm, as well as an allegation that defendant suffered a prior prison conviction. After pleading no contest to the felon in possession of a firearm charges and admitting the prison prior, defendant proceeded to jury trial on the remaining charges and allegations. As detailed above, he was found guilty of first degree murder with special

---

[4] As Barnes suffered from memory loss at the trial, he was impeached with his recorded interview with the police.

4

circumstances; the allegation that he personally used a firearm was found true, as was the allegation that he intentionally discharged a firearm; the other firearm enhancement was found not true. He was sentenced to life in prison without the possibility of parole;[5] this timely appeal followed.

## II. Discussion

### A. *Voluntariness of Defendant's Statement*

The People bear the burden to establish by a preponderance of the evidence that a defendant's confession was voluntary. (*People v. Massie* (1998) 19 Cal.4th 550, 576 (*Massie*).)[6] In determining whether a confession is voluntary, the question is whether defendant's will was overborne, so that his choice to confess was not essentially free. (*People v. Memro* (1995) 11 Cal.4th 786, 827.) "On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review. [Citations.]" (*Massie, supra,* at p. 576.) We must determine " '[w]hether the influences brought to bear upon the accused were "such as to overbear [defendant]'s will to resist and bring about confessions not freely self-determined." [Citation.]' " (*Thompson, supra,* 50 Cal.3d at p. 166.) To this end, we examine " ' "all the surrounding circumstances—both the characteristics of the accused and the details of

---

[5] The trial court imposed sentences on other counts and enhancements, which were stayed.

[6] In his opening brief, defendant states that the burden of proof regarding voluntariness of a confession is proof beyond a reasonable doubt. As the court explained in *Massie*, "The federal Constitution requires the prosecution to establish, by a preponderance of the evidence, that a defendant's confession was voluntary. [Citation.] The same is now true under California law as a result of an amendment to the state Constitution enacted as part of Proposition 8, a 1982 voter initiative. [Citations.]" (*Massie, supra*, 19 Cal.4th at p. 576.) Defendant appears to have caught his error, as his reply brief correctly refers to the burden of proof as a preponderance of the evidence (although defendant cites the same case, *People v. Thompson* (1990) 50 Cal.3d 134, 166 (*Thompson*), for both positions). *Thompson* merely recognizes, as stated in *Massie* above, that the burden of proof for voluntariness of confession is proof beyond a reasonable doubt for those cases arising *before* the enactment of Proposition 8. (*Thompson, supra*, at p. 166.)

5

the interrogation." [Citation.]' " (*Ibid.*) Simply put, we must determine, based upon a totality of the circumstances, if the statement was the product of defendant's own free will, or was his will overborne by police coercion, whether express or implied. (See, e.g., *People v. Smith* (2007) 40 Cal.4th 483, 501–502.)

On appeal, defendant claims that his statement to Sergeant Phillips was involuntary due to the coercive conditions he was subjected to prior to and during the interview (including the length of time he was kept in the interview room, the alleged lack of access to bathroom facilities, water, food, or a bed, and room temperature) and due to police interrogation tactics (including alleged threats and promises, and deception). We disagree.

Defendant was awoken at his home and arrested at approximately 8:00 a.m. on December 1, 2009. He was taken to the Oakland Police Department and placed in an interview room at 9:50 a.m. At 11:15 p.m., he was interrogated by Sergeant Phillips. Sergeant Phillips explained that the reason for the 13-hour delay before defendant's interview was the need to complete tasks related to the searches and arrests, and to evaluate available information before conducting the interview, including reviewing reports written by other officers and interviewing individuals detained during the execution of the search warrants, as well as interviewing codefendant Tisdale (which began at 8 p.m.).

During the 13 hours he was kept in the interrogation room,[7] defendant was checked on regularly by police officers (a log indicates he was checked on nine times), and asked if he needed food or drink, or to use the bathroom.[8] On one occasion he was given juice; on another occasion he was given a jacket after he complained that he was cold.[9] He was otherwise dressed in a shirt, pants and socks. The temperature in the room

---

[7] The interrogation room was 12-feet square, with four large windows facing the homicide department.

[8] The log does not reflect that he was offered or given food, but Sergeant Phillips testified that he believed food was offered to defendant.

[9] He again complained of being cold when Sergeant Phillips began the interview.

6

had previously been turned down in response to a comment by defendant. The log indicated that defendant went to sleep at one point, and indeed Sergeant Phillips woke defendant up when he came in to interview him. Defendant was sleeping on a table in the interview room. After obtaining a *Miranda* waiver (*Miranda v. Arizona* (1966) 384 U.S. 436), Sergeant Phillips interviewed defendant from 11:15 p.m. until 1:08 a.m. At 1:50 a.m., defendant was placed in a room with Tisdale and they were allowed to talk alone, and they then spoke with officers (for approximately 50 minutes total).

The trial court found that the temperature change in the room was not a tactic by the police, but rather was just the defendant complaining about what he did not like (first the room was too warm, then too cold). The trial court found there were no extreme temperature changes. While the defendant was kept waiting for several hours before his interview began, due to the need to complete other parts of the investigation first, he was not denied food, water or drink or the opportunity to use the facilities. He was checked on regularly. He was brought juice, when he requested it. The police did not prevent him from sleeping; he did sleep (albeit on a table rather than a bed). Other than complaining about the temperature in the room (which the police apparently tried to respond to first by changing the temperature and later by providing defendant with a jacket), defendant did not complain about the conditions. He did not indicate that he was being deprived of food or drink or use of the facilities. During the interview, an officer offered defendant a soda and asked if he needed to go to the bathroom. He did not appear to be worn down by the conditions, as he minimized his role in the robbery and shooting. On these facts, we find nothing coercive regarding the conditions preceding or during the interview, which itself lasted less than three hours (including the time he was with Tisdale).

As far as defendant's complaints about the interview techniques, we also find those unavailing. First, we note that Sergeant Phillips testified that he made no threats or promises of leniency to defendant during the interview; he also testified that he did not raise the issue of the death penalty. Defendant first contends that he was threatened and/or promised leniency by Sergeant Phillips, when Phillips told him that, "We got to present the shit to the DA . . . the way it looks now—ya'll look like— ya'll look like real

7

wolves . . . if it stays the way it is now, man.  [¶] . . . [¶]  [I] mean somebody gotta explain something 'cause ya'll look like wolves, man.  Ya'll look like menaces.  *And you know what they do to them*."  (Italics added by defendant.)[10]  Despite defendant's contention to the contrary, this was not a threat that defendant was going to receive the death penalty.  The excerpt comes at a point in the interview where Sergeant Phillips was explaining that this was a particularly brutal and violent crime, and that defendant had nothing in his criminal history involving that kind of violence.  He was trying to give defendant the opportunity to explain how and why the shooting happened, including any mitigating circumstances.  The consequences that would flow from such a senseless and brutal murder would otherwise be severe; Phillips was merely explaining truthfully the consequences that would flow from the commission of such an offense.  This was not an impermissible threat of imposition of the death penalty.  (*People v. Holloway* (2004) 33 Cal.4th 96, 115–116.)

The statements by Phillips also were not an implied promise of leniency, but were merely an offer of the opportunity to tell the truth about what happened.  Defendant also complains that at one point Sergeant Phillips told him that if what defendant said did not line up with other evidence, "then you gonna look like you lying and *it's going to be all bad*."  (Italics added by defendant.)  Phillips went on to reference defendant's past criminal history, saying "you've been involved with some shit.  You know how this shit flow better than I know."  Although the relevance of this passage is not explained in his brief, presumably defendant is arguing that these comments also constituted a threat.  To the contrary, it appears that Sergeant Phillips was merely explaining that defendant knew from his past experiences with the criminal justice system that if the evidence

---

[10] The Attorney General argues that this particular issue was forfeited as it was not relied upon by defendant below.  While defense counsel below was focused on the length of time defendant was confined prior to the interview and the conditions of that confinement, this was an in limine motion by the prosecution to admit defendant's statement and the prosecutor asked Sergeant Phillips questions relating to issues of threats and promises.  The issue of threats and promises appears to have been before the trial court.

demonstrated he was lying, it would not look good.  None of this amounted to implied coercion.[11]

Defendant also argues that Sergeant Phillips used deception, telling defendant that he had been identified by a witness even though he had not been.  Police may, of course, lie to those they interrogate.  (*Thompson*, *supra*, 50 Cal.3d at p. 167.)  They may imply that they know more than the suspect does, or that they have evidence that the suspect does not possess.  (*People v. Jones* (1998) 17 Cal.4th 279, 297.)  While lies told to a defendant by the police may impact the voluntariness of an ensuing confession, "they are not per se sufficient to make it involuntary.  [Citation.]"  (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1240 (*Musselwhite*).)  Deception does not "undermine the voluntariness of a defendant's statements to the authorities unless the deception is ' " 'of a type reasonably likely to procure an untrue statement.' " ' "  (*People v. Williams* (2010) 49 Cal.4th 405, 443.)  This deception was not of the type likely to induce a false confession by defendant (and indeed it did not induce a full confession, as defendant continued to minimize his involvement).

We must also bear in mind characteristics of the defendant, including his age (an adult in his 30's) and his prior criminal experience (prior arrests and prosecutions, including one resulting in a state prison commitment).  Considering all of the circumstances, we find defendant's statement was voluntarily made; the trial court did not err in so ruling.  As the trial court said, "[t]here is nothing here . . . that comes close to rising to the idea that this statement is involuntary . . . ."  We conclude, as the court did in *Musselwhite*, "[i]n short, evaluating the circumstances of the police questioning of defendant in its totality, we conclude it falls short of rendering his confession . . . involuntary in any constitutionally meaningful sense."  (*Musselwhite*, *supra*, 17 Cal.4th at p. 1243.)

---

[11] Again, we note that these statements by Phillips obviously did not overbear defendant's will, since he never admitted that he had a gun or fired it (instead totally denying his involvement in the shooting).

*B. Failure to Instruct Upon Elements of Felony-Murder Special Circumstances*

As the Attorney General concedes, the trial court erred in omitting a portion of the special circumstances instruction. The trial court instructed, pursuant to CALJIC No. 8.80.1 that if the jury found defendant guilty of murder in the first degree, they must then determine if the following special circumstances were true or not true: (1) that the murder was committed by defendant when he was engaged in the attempted commission of robbery, and (2) that the murder was committed by defendant when he was engaged in the commission or attempted commission of the crime of burglary. The court further instructed that *if the jury determined that defendant was the actual killer*, unless an intent to kill was an element of the special circumstance, they did not have to find defendant intended to kill in order to find the special circumstance to be true. (Italics added.) The trial court failed to instruct, however, on the requirements if the jury were to find that defendant was not the actual killer. The omitted language from CALJIC No. 8.80.1 would have indicated that: "If you find that a defendant was not the actual killer of a human being, [or if you are unable to decide whether the defendant was the actual killer or [an aider and abettor] . . . you cannot find the special circumstance to be true . . . unless you are satisfied beyond a reasonable doubt that such defendant *with the intent to kill* [aided,] [abetted,] . . . [or] [assisted] any actor in the commission of the murder in the first degree] [.] [, or *with reckless indifference to human life and as a major participant*, [aided,] [abetted,] . . . [or] [assisted] in the commission of the crime of [attempted robbery or burglary or attempted burglary] which resulted in the death of a human being . . . .]" (CALJIC No. 8.80.1, italics added.) This omission was clearly error; the issue remains as to whether or not that error must lead to reversal of the true findings as to the special circumstances allegations.

First, it must be noted that it is apparent from the verdicts of the jury that they did not find defendant guilty of first degree murder because he was the actual killer. While

the jury found defendant guilty of first degree murder,[12] they found not true the allegation that he personally and intentionally discharged a firearm causing great bodily injury or death.[13] Thus, the jury determined that defendant was not the actual killer. Thus, the omitted language from CALJIC No. 8.80.1 was relevant to the jury's determination of whether the felony murder special circumstances were true.

Omission of these very same elements from the felony murder special circumstance instructions was at issue in *People v. Mil* (2012) 53 Cal.4th 400, 410–420 (*Mil*). The court found such error was not structural error, but was subject to a harmless error analysis under *Chapman, supra,* 386 U.S. 18. (*Mil, supra,* at pp. 411–414.) As the California Supreme Court recently explained in *People v. Gonzalez* (2012) 54 Cal.4th 643, 666 (*Gonzalez*), the appropriate harmless error test for jury instructions which erroneously omit an element of an offense "does not require proof that a particular jury 'actually rested its verdict on the proper ground [citation], but rather on proof beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error [citation]. . . .' " (Italics omitted.) Proof of the former can be proof of the latter, but such a determination is not essential to a finding of harmlessness. A reviewing court often must conduct a thorough examination of the record in order to determine if the error was harmless. (*Gonzalez, supra,* at p. 666.)

As *Mil* explained, "*Neder* instructs us to 'conduct a thorough examination of the record. If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error—for example, where the defendant contested the omitted element and raised evidence sufficient to

---

[12] The jury was instructed upon two theories of first degree murder: premeditated and deliberate first degree murder and first degree felony murder. The verdict form did not indicate which theory the jury relied upon in finding defendant guilty of first degree murder.

[13] Defendant repeatedly states that the jury was instructed that "it *did not* have to find intent to kill to find special circumstances." The portion of CALJIC No. 8.80.1 that he references only applies, as it clearly states, if the jury finds that the defendant *was* the actual killer. It has no applicability to the situation at issue here, where the jury does not find the defendant to be the actual killer.

11

support a contrary finding—it should not find the error harmless.' [Citation.]  On the other hand, instructional error is harmless 'where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence.' [Citations.]" (*Mil*, *supra*, 53 Cal.4th at p. 417.)  Just as in *Mil*, our task, then, "is to determine 'whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element.' [Citations.]" (*Ibid*.)

The omitted elements here, as in *Mil*, are that the defendant must have either had the intent to kill, or have been a major participant in the underlying felony and acted with reckless indifference to life.  The Attorney General apparently concedes the issue of whether defendant had the intent to kill and argues instead that the error was harmless beyond a reasonable doubt "because the evidence necessarily established [he] was a major participant and acted with reckless indifference to human life."  Our analysis shall, therefore, focus on the latter two elements that were not instructed upon.

A " ' "major participant" ' " in the underlying felony is one whose participation is " ' "notable or conspicuous in effect or scope" ' " or " ' "one of the larger or more important members" ' " of the group committing the underlying felony.  (*People v. Smith* (2005) 135 Cal.App.4th 914, 928, questioned on other grounds in *People v. Garcia* (2008) 168 Cal.App.4th 261, 291–292.)  This level of participant is to be contrasted with the hypothetical "nonmajor participant" in *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*), such as a participant who "merely [sat] in a car away from the actual scene of the murders acting as the getaway driver to a robbery." (*Tison, supra,* at p. 158.)  The mental state of reckless indifference to human life " '[i]s one in which the defendant "knowingly engage[es] in criminal activities known to carry a grave risk of death" . . .' [citation] [and] requires the defendant be '*subjectively* aware that his or her participation in the felony involved a grave risk of death.' [Citations.]" (*Mil*, *supra*, 53 Cal.4th at p. 417, original italics.)  As noted in *Tison*, the major participant and reckless indifference elements often overlap.  (*Tison*, *supra*, at p. 158.)

12

As detailed by the Attorney General, there was ample evidence supporting both of these elements that were missing from the jury instructions; indeed, defendant "does not contest the sufficiency of the evidence to support these findings." Included in this evidence is defendant's admission that he knew the robbery was going to take place, that it was his van that was used in the crime, that he knew the victims were home, and that he admitted breaking the window in order to gain entry into the home. Additionally, according to witness Bogue, defendant stuck his firearm through the window he broke and said, "We're serious," and later fired his gun at Holowatch as the victim was struggling with another robber over the submachine gun, enabling that robber to regain control of the submachine gun and shoot the victim. Witness Barnes had indicated that defendant told him that he and Tisdale picked up the submachine gun from Barnes' apartment because they wanted to use it in a robbery. Whether there was sufficient evidence to support these findings, however, is not the issue. As the court made clear in *Mil,* "our task in analyzing the prejudice from the instructional error is whether any rational fact finder could have come to the *opposite* conclusion." (*Mil*, *supra*, 53 Cal.4th at p. 418, original italics.)

Defendant argues that there was evidence before the jury from which a rational fact finder could have come to the conclusion that he was not a major participant in the attempted robbery and burglary, and that he did not act with reckless indifference to human life—his statement to the police. Specifically, he argues that his statement indicated he was a nonviolent drug hustler, that he did not have a gun, that he did not participate in the shooting, and that he did not plan the robbery. While some hypothetical rational jury might have been able to rely upon this evidence, if believed, to support a finding that defendant was not a major participant who acted with reckless indifference to human life had they been properly instructed, that would require that they fully accepted defendant's version of the events. Despite defendant's attempt in his statement to the police to minimize his role in the events leading to the victim's death, the jury found beyond a reasonable doubt that defendant not only personally used a firearm, but that he

13

also intentionally discharged that firearm during the commission of murder.[14]  The jury apparently rejected defendant's account minimizing his participation in the crimes and accepted other evidence, including the account of witness Bogue.  No rational jury, having found that defendant personally used and intentionally discharged a firearm under the facts in this case could conclude that he was not a major participant who acted with reckless indifference to human life.  The trial court's error in omitting the relevant portion of CALJIC No. 8.80.1 was, therefore, harmless beyond a reasonable doubt.

### III. Disposition

The judgment is affirmed.


_____
Sepulveda, J.*


We concur:


_____
Margulies, Acting P.J.


_____
Dondero, J.


* Retired Associate Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

---

[14] Although defendant on appeal relies on the jury's finding that he did not intentionally discharge a firearm causing great bodily injury or death as evidence that the jury did not find he was the actual killer, he ignores the jury's specific findings that he personally used a firearm and that he intentionally discharged a firearm.

14