Filed 4/26/13  P. v. Reyes CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ALMA DELIA REYES,<br><br>    Defendant and Appellant. | F062305<br><br>(Super. Ct. No. VCF209407E)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Joseph A. Kalashian, Judge.

Han N. Tran, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and John W. Powell, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury convicted appellant Alma Delia Reyes of 14 various felony and misdemeanor offenses, all pertaining to real estate transactions where Reyes, a realtor, misrepresented clients' income and other information in loan applications and misrepresented information about the real property in order to obtain loan financing and complete a sale. She challenges her conviction on one misdemeanor count, false statement by a real estate agent, on the basis of instructional error and insufficient evidence. Reyes also raises multiple challenges to her sentence on the basis of Penal Code section 654.[1] Finally, she contends the abstract of judgment contains errors and must be corrected. The People essentially concede the issues raised by Reyes.

We will reverse the count 24 conviction on the basis of instructional error and remand for resentencing in conformance with this opinion and with directions that any terms of imprisonment imposed on counts 2, 5, 8, 12, 21, 22, 23, and 26, as well as the section 12022.6 enhancements appended to counts 5, 12, and 26 should be stayed pursuant to section 654.

## FACTUAL AND PROCEDURAL SUMMARY

During 2004 and 2005, real estate prices were increasing dramatically. Many lenders and brokers were granting "stated income loans" during this time. For a stated income loan, the borrower was required to state his or her occupation and income on the loan application; this information often was not verified. A loan officer was supposed to verify employment, but generally would not verify income against tax returns or other financial documents.

Reyes acted as the real estate agent for Clarita Rios and Leonel Sanchez (sometimes referred to as the couple) in their purchase of five properties—Dickran Drive, Spruce, Foster Drive, Tyson Avenue, and Terra Bella—and was their agent in the subsequent sales of the Dickran Drive, Foster Drive, and Spruce properties. With Reyes

---

[1]All further statutory references are to the Penal Code unless otherwise stated.

as their realtor, Rios and Sanchez would buy five properties in the span of about five or six years.  When Rios and Sanchez obtained loans to buy the properties, several times the loan applications had been completed by someone else before they were asked to sign documents.  On other occasions, the couple signed blank loan application documents and the documents were filled in later by someone else.

Reyes also acted as real estate broker for Alejandra Ramirez and her husband Ricardo Velazquez in a series of real estate deals.

### A.  Sales with Rios and Sanchez

Rios and Sanchez were husband and wife.  Rios had a high school education; Sanchez spoke primarily Spanish and had not completed school beyond the elementary grade levels.  Sanchez worked for Bosman Dairy and had never made more than $3,200 per month.  Rios was a homemaker.

#### *Dickran Drive*

In 2001 or 2002, Reyes helped Rios and Sanchez purchase their first home on Dickran Drive.  Sanchez's brother had to cosign the loan because the couple did not qualify based on Sanchez's income alone.  The monthly payment was $600 to $800 per month.  Rios and Sanchez rented out the Dickran Drive property and continued living on the Bosman dairy, where they were provided a home as part of Sanchez's employment benefits.

Sometime after 2005, the Dickran Drive property was sold.  The couple netted around $30,000 in profit from the sale.  Reyes was the agent in the sale and made a commission.

#### *Spruce*

About two years after they bought the Dickran property, Reyes told Rios and Sanchez about property for sale on Spruce.  The couple decided to buy the property and move into the house.  This property was larger than the Dickran Drive property.  The Dickran Drive property was refinanced and the cash from the refinance was used as the

3.

down payment on the Spruce property. The monthly mortgage payments on the Spruce property were between $1,300 and $1,500.

The loan application for the Spruce property incorrectly stated Sanchez's income as $6,500 and overstated the couple's personal property. When Rios pointed out to Reyes that a number of items on the loan application were incorrect, Reyes told her that lying on the loan application was the only way for them to own a home. Reyes assured Rios the banks did not care about the values as long as the loan payments were made.

At the suggestion of Reyes, Sanchez was the sole purchaser on the documents and Rios signed a grant deed to convey her interest in the property to Sanchez. After renting out the Spruce property for several months, Rios and Sanchez moved into the house in mid-2005. Around this time, Sanchez quit his job and took a seven-month vacation.

The Spruce property was sold not long after, netting a profit of between $25,000 and $50,000. Again, Reyes was the agent on the sale and made a commission.

### *Foster Drive*

In January 2005, Reyes told Rios and Sanchez about the Foster Drive property and the couple purchased it less than two months after purchasing the Spruce property. The Foster Drive property had three houses on it. The loan application used to purchase the Foster Drive property stated that Rios had an income of $8,500 per month. Rios and Sanchez rented out the houses on the Foster Drive property. At some point, some of their tenants failed to pay rent and were forced to move out.

At this time, Rios and Sanchez owned three properties, Dickran Drive, Spruce, and Foster Drive. The total combined mortgage payment for all three properties was approximately $4,000 per month. They were collecting rent of about $1,900 from the Foster Drive and Dickran properties. Sanchez again began working at the dairy and was earning a salary of around $1,500 to $1,600 per month.

Five months after purchasing the Foster Drive property, Rios and Sanchez wanted to sell it. Rios told Reyes she wanted to sell it for $499,000. It ended up selling for

4.

approximately $449,000 and made a profit of approximately $85,000 for Rios and Sanchez.

### Tyson Avenue

In September 2005, Reyes contacted Rios about property on Tyson Avenue for sale. Reyes described the property as a "fixer-upper" available for a low price. The couple purchased the Tyson Avenue property for $120,000. The loan application for the Tyson Avenue property stated too high a figure for Sanchez's income, overstated the value of the couple's personal property assets, and incorrectly stated Sanchez's job at the dairy as a breeder.

### Terra Bella

In 2006 Reyes contacted Rios and told her of property in Terra Bella that was large and where animals could be kept. In September 2006, Rios and Sanchez purchased the property. Reyes told the couple the Terra Bella property needed to be purchased in Rios's name alone. Reyes instructed Sanchez to sign a deed conveying any interest he had in the property to Rios.

The loan application for the Terra Bella property contained numerous inaccuracies, including a false work history and employment income for Rios. The application stated Rios had a base income of $7,250 and a monthly income of $9,730, with cash in the bank of $22,000. Rios told Reyes all this information was false, but Reyes told her not to worry as long as the payments on the loan were made. The mortgage payments on the Terra Bella loan were about $3,000 per month.

### Subsequent Events

Despite selling the Dickran Drive, Spruce, and Foster Drive properties, Rios and Sanchez were unable to keep up with the remaining mortgage payments and the Tyson Avenue and Terra Bella properties went into foreclosure. Rios and Sanchez ended up owing over $16,000 in back taxes and having no assets. When police began investigating the transactions, Reyes told the couple not to speak to the police.

### B. Ramirez and Velazquez Transactions

Ramirez and Velazquez lived in Stockton and spoke very little English. They owned a three-bedroom home in a working class neighborhood. Ramirez made $9.00 per hour as a nurse's assistant; Velazquez made about $1,500 a month as a janitor.

Ramirez met Reyes at the home of a family member. Ramirez told Reyes she was considering moving to Tulare to attend school and was interested in a rental; Reyes told her to buy instead.

#### *River Oak*

In July 2005, with Reyes as her agent, Ramirez purchased property on River Oak in Porterville. Reyes told Ramirez she should purchase the property in her name alone. Reyes gave Ramirez a stack of papers to sign and a brief summary of the documents she was signing.

People were living on the property when Ramirez purchased it and Reyes told Ramirez they would be paying rent. After two or three months, Ramirez told Reyes she wanted the tenants to move out so she could move onto the property.

#### *Foster Drive*

Shortly after purchasing the River Oak property, Reyes contacted Ramirez and told her of another property for sale on Foster Drive. This was the same property Reyes had sold to Rios and Sanchez that was now for sale again. Reyes told Ramirez there were three houses on the property -- one for Ramirez to live in and two that Reyes could rent out for her. Reyes did not tell Ramirez that the two rental houses lacked proper permits and legally could not be rented. Reyes did tell Ramirez that all the houses currently were rented, generating $600, $800, and $1,200 per month in rental income between all three houses. Based upon this information, Ramirez expected to collect around $2,000 per month in rent.

Reyes told Ramirez that Velazquez was qualified to purchase the Foster Drive property and that they could sell or rent out the River Oak property in order to afford the

Foster Drive property. Reyes told Ramirez and Velazquez their monthly payment for the Foster Drive property mortgage would be around $2,800 per month.

While waiting for the sale to be completed, Ramirez was admitted to nursing school in Stockton and no longer wanted to purchase the Foster Drive property. Ramirez repeatedly tried to contact Reyes. When she finally reached her, Reyes told Ramirez she would lose her $5,000 deposit if she failed to follow through on the purchase.

Reyes began pressuring Ramirez to follow through on the purchase and told Ramirez the seller was in the hospital and dying. At some point, a letter was sent to the mortgage office by someone claiming to be Velazquez; the letter was in perfect English. Velazquez never sent or signed the letter.

One Sunday afternoon, Reyes called and asked Ramirez for her home address because she was on her way with documents for her to sign. She told Ramirez to have $3,000 cash ready for her when she arrived. Reyes arrived around 8:00 or 9:00 p.m., along with her assistant/notary Nelda Garcia.

As soon as they arrived, Ramirez was asked to take Reyes to a copy store to make copies; Garcia stayed with Velazquez. Garcia told Velazquez to sign the stack of documents she had brought with her and that the documents would be explained to him when Reyes and Ramirez returned. Velazquez signed.

Ramirez and Reyes returned without Reyes having made any copies. Garcia was waiting outside and told Ramirez she and Reyes had to leave. Ramirez exited the vehicle immediately. Garcia told Ramirez that Velazquez had signed all the documents. Ramirez asked for copies and asked if all the repairs to the property had been made as promised. Reyes assured Ramirez it was "already in writing."

When Ramirez and Velazquez arrived at the title company to sign paperwork for the purchase, they discovered the purchase price was $50,000 more than they had agreed. Ramirez instructed Velazquez not to sign and the title company called Reyes. Reyes called back and told Ramirez the buyer would lower the price and that the houses would

7.

be fixed up and move-in ready as soon as the tenants vacated. Ramirez had been told she could not see the inside of the houses because the tenants were still living there.

The loan application for the Foster Drive property contained numerous false statements. The application stated Ramirez and Velazquez owned a business, made $9,800 per month, had $30,000 in their bank account, and had $25,000 in personal property assets (furniture). Ramirez and Velazquez never provided any of this false information to Reyes.

After the sale of the Foster Drive property closed, Reyes told Ramirez she still could not inspect the property because the tenants still were in the residence. Eventually, Reyes made an appointment to meet Ramirez and Velazquez at the Foster Drive property at 9:00 p.m. and hand over the keys; Reyes handed over the keys and left immediately.

Ramirez and Velazquez went inside the houses for the first time. One house was occupied by tenants. When they went inside the second home, there were no lights and it had a horrible smell. They obtained a flashlight and discovered both unoccupied houses were uninhabitable: water leaked from a broken sink, the windows were broken, electrical wires were exposed, and the carpets were littered with cat or dog feces. Ramirez and Velazquez immediately called Reyes but were unable to reach her; they tried calling 10 times. The next day they went to Reyes's home. Although Reyes's car was in the driveway, they were told she was not at home.

Ramirez and Velazquez tried to make payments on the Foster Drive property for the next year but fell behind and lost the property to foreclosure. They also were making payments on the River Oak property, where rental income covered about one-half the monthly mortgage payment. After about three years, Velazquez lost his job and Ramirez's work hours were reduced. They lost this property to foreclosure.

**C. Investigation and Trial**

In September 2006, Lori Cant, a friend of Velazquez's, called the Tulare County District Attorney's Office and spoke to Investigator Dwayne Johnson. Cant reported that

8.

she believed Velazquez had been given a fraudulent loan. Johnson began an investigation of some of Reyes's real estate transactions, eventually focusing on the Spruce, Foster Drive, Tyson Avenue, Dickran Drive, and Terra Bella properties.

Johnson spoke to Reyes about the Foster Drive property transactions. Reyes claimed she thought Ramirez and Velazquez could make the mortgage payments from the rental income, admitted she knew their income was not as stated in the loan documents, and then retracted that statement, and verified she had not done any walk-through of the Foster Drive property with Ramirez and/or Velazquez.

The Office of Real Estate Appraisers received a complaint from Velazquez alleging that an appraiser, Richard Gutierrez, had overvalued the Foster Drive property. That office investigated and concluded that Gutierrez had (1) overestimated both the size of the lot and of the home on the property; (2) erroneously listed garage footage as living space; (3) failed to take into account the proximity of the property to an arterial street, which lowered its value; (4) failed to use comparable real sales of properties located nearby to help establish value, instead using properties nine or 10 miles away; and (5) fixed a value that was identical to the sales price of $445,000 when comparable property adjacent to the Foster Drive property had sold for $261,000 a few days before the sale to Ramirez and Velazquez. The Office of Real Estate Appraisers concluded that Gutierrez had manipulated the appraisal to facilitate a sale for $445,000; a subsequent appraisal fixed a value of $263,500 for the Foster Drive property.

The Tulare County District Attorney filed criminal charges against Reyes, alleging 18 separate offenses involving the real estate transactions, including obtaining money, labor, or property by false pretenses, conspiracy to commit the crime of making false financial statements, conspiracy to fraudulently obtain money or property by false pretenses, filing a false or forged instrument, false statement by a commissioned real estate agent, and money laundering. As to multiple counts, it was alleged that each

9.

offense resulted in a loss exceeding $50,000 and that the aggregate loss exceeded $500,000.

At the close of the People's case-in-chief, Reyes moved to dismiss pursuant to section 1118.1. The People dismissed two grand theft counts and the trial court granted Reyes's motion to dismiss a residential burglary count. The motion was denied as to all other counts.

On August 24, 2010, the jury convicted Reyes of 14 counts and acquitted on the money laundering charge. As to eight of the counts, the jury found true that the property loss exceeded $50,000. No finding was made by the jury as to the aggregate amount of the loss because no verdict form for this was submitted to the jury.

The trial court pronounced sentence on February 17, 2011. Probation was denied and Reyes was sentenced to an aggregate term of three years in prison.

## DISCUSSION

Reyes argues the count 24 conviction for violating section 536, misdemeanor false statement by a commissioned sales agent, should be reversed for instructional error and insufficiency of the evidence. Reyes also contends that because there were only five mortgage transactions, she can be punished only for five counts and the punishment for the remaining counts must be stayed pursuant to section 654. Finally, Reyes claims the abstract of judgment contains multiple clerical errors that should be corrected.

The People essentially concede that Reyes's contentions are correct.

## I.       Count 24 Offense

Count 24 charged Reyes with violating section 536, misdemeanor false statement by a commissioned agent. As the People concede, the jury was not instructed on any of the elements of the offense.

A trial court has a sua sponte duty to instruct on all of the elements of a charged offense. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1311.) A failure to instruct on all of the elements of an offense is not reversible per se, but is subject to harmless error

10.

analysis under *Chapman v. California* (1967) 386 U.S. 18, 24, meaning that the conviction is upheld if it appears beyond a reasonable doubt that the error did not contribute to the verdict. (*People v. Magee* (2003) 107 Cal.App.4th 188, 194.)

A complete absence of instruction on all elements of an offense will be found harmless only in unusual circumstances. (*People v. Mil* (2012) 53 Cal.4th 400, 414.) Here, there are no unusual circumstances that would allow us to conclude the complete absence of instruction on the elements of the offense was harmless. Accordingly, we will reverse the count 24 conviction for instructional error. In light of the reversal for instructional error, we need not address Reyes's other contentions regarding this count.[2]

## II.     Section 654

Reyes contends that section 654 prohibits imposition of punishment on more than one count for each of the five real estate transactions because each transaction had one common objective. Here, the People concede that the concurrent sentences imposed on counts 2, 5, 8, 12, 21, 22, 23, and 26 should be stayed. After review of the record, we agree.

Section 654 provides in pertinent part, "An act or omission that is punishable in different ways by different provisions of [the Penal Code] shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision.…" The case of *Neal v. State of California* (1960) 55 Cal.2d 11, 19 stands for the proposition that, "Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the

---

[2]The parties disagree on the sufficiency of the evidence to support the conviction on the count 24 offense. Reyes did make a section 1118.1 motion in the trial court with respect to count 24, which was denied. Because a properly instructed jury has not considered this offense, we decline to rule on the evidentiary issue.

actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses, but not for more than one."

If, however, a defendant harbors multiple criminal objectives, he or she may be punished for the independent violations committed in pursuit of each objective even though they are part of an indivisible course of conduct. (*People v. McGuire* (1993) 14 Cal.App.4th 687, 698 (*McGuire*).) Furthermore, when a substantive offense is stayed pursuant to section 654, any accompanying enhancement to that offense also must be stayed. (*People v. Bracamonte* (2003) 106 Cal.App.4th 704, 709 (*Bracamonte*).) In addition, imposition of a concurrent sentence violates section 654's prohibition against multiple punishments. (*People v. Deloza* (1998) 18 Cal.4th 585, 592 (*Deloza*).)

Finally, when both the conspiracy and the substantive offense are part of an indivisible course of conduct and the conspiracy has no objective other than the substantive offense, section 654 precludes the imposition of punishment on both counts. (*In re Cruz* (1966) 64 Cal.2d 178, 180-181 (*Cruz*); *People v. Cavanaugh* (1983) 147 Cal.App.3d 1178, 1181-1183.)

### Counts 1 and 2

Counts 1 and 2 were based on the Spruce property transaction. In count 1, Reyes was convicted of obtaining money, labor, or property by false pretenses; in count 2, Reyes was convicted of conspiracy to commit the misdemeanor of making false financial statements. Both offenses pertained to Reyes's role in obtaining loan funds through the use of fraudulent loan documents. The evidence established that Reyes had participated in preparing loan application documents that significantly overstated income and personal property assets. In closing argument, the prosecutor argued for conviction on these counts based on Reyes's role in assisting Rios and Sanchez in submitting fraudulent loan application documents in order to obtain the Spruce property loan.

Both the count 1 and 2 offenses shared the same criminal objective of obtaining the loan funds. The count 2 conspiracy to make false financial statements was incidental

12.

to the submission of those false financial statements to obtain the loan (count 1). Section 654 precludes the imposition of punishment on both counts 1 and 2. (*Cruz, supra,* 64 Cal.2d at pp. 180-181.) Further, since a concurrent sentence violates section 654's prohibition against multiple punishments (*Deloza, supra* 18 Cal.4th at p. 592), we will order the term imposed on count 2 be stayed.

### Counts 4 and 5

Counts 4 and 5 were based on the Tyson Avenue property transaction. The loan application documents for the Tyson Avenue property incorrectly stated income, assets, and Sanchez's job. The count 4 conviction was for obtaining money, labor, or property by false pretenses; count 5 was a conviction for conspiracy to commit the misdemeanor of making false financial statements. In urging the jury to convict Reyes on the count 4 and 5 offenses in closing argument, the prosecutor argued that the fraudulent representations on the loan documents and the conspiracy were "the same theory." Here, again, both offenses shared a common criminal objective to obtain the loan funds. The object of the conspiracy among Reyes, Rios, and Sanchez in crafting false financial statements was to obtain funds by false pretenses. Consequently, the count 5 conspiracy count was incidental to the count 4 offense.

The punishment imposed for the count 5 offense should be stayed. Likewise, the sentence imposed for the section 12022.6 enhancement appended to count 5 also should be stayed. (*Bracamonte, supra,* 106 Cal.App.4th at p. 709.)

### Counts 7 and 8

The count 7 and 8 convictions were for Reyes's involvement in the first Foster Drive transaction of the sale of the property to Rios and Sanchez. The evidence established that Reyes had helped prepare loan application documents falsely representing that Rios had a monthly income of $8,500. At trial and in closing argument, the prosecutor indicated that counts 7 and 8 were based upon Reyes's actions in helping

13.

Rios and Sanchez prepare and file fraudulent loan applications in order to obtain the loan to purchase the Foster Drive property.

Count 7 was obtaining money, labor, or property by false pretenses; count 8 was conspiracy to commit the misdemeanor of making false financial statements. Once again, the obtaining of loan funds by false pretenses was the direct result of the object of the conspiracy, which was to make false financial statements. The evidence did not support a conclusion that there were multiple, independent criminal objectives. (*McGuire, supra,* 14 Cal.App.4th at p. 698.) Imposition of punishment on count 8 should be stayed pursuant to section 654.

### Counts 25 and 26

Counts 25 and 26 were based on the Terra Bella property transaction. Count 25 was a conviction for obtaining money, labor, or property by false pretenses; count 26 was a conviction for conspiracy to commit the misdemeanor of making false financial statements. The evidence presented at trial showed that Reyes assisted in preparing and submitting loan application documents showing a false income, employment, and bank account balance. In closing argument, the prosecutor noted that these two counts were based upon Reyes assisting Rios and Sanchez in filing false loan application documents. The conspiracy was the means through which the documents were prepared and the loan obtained; both offenses had a single objective of obtaining the loan. Under the facts of this case, section 654 precludes imposition of punishment on both counts. The punishment imposed on the enhancement appended to count 26 also must be stayed.

### Counts 10, 12, 21, 22 and 23

These five counts all pertain to the second Foster transaction -- the sale of the property to Ramirez and Velazquez. The documents submitted in order to obtain the loan for this transaction included numerous false statements about Ramirez's and Velazquez's income and assets. Count 10 charged conspiracy to commit the crime of fraudulently obtaining money, labor, or property by false pretenses; count 12 was conspiracy to

14.

commit the misdemeanor of making false financial statements; and counts 21, 22, and 23 were for filing false or forged instruments.

The prosecutor's closing argument relates all the conduct surrounding counts 10, 12, 21, 22, and 23 to a single objective -- the conspiracy to commit the crime of fraudulently obtaining money, labor, or property by false pretenses (count 10). The conspiracy to make misdemeanor false statements and the three counts of filing false or forged documents were all in furtherance of the count 10 offense.

Therefore, section 654 precludes imposition of punishment on all five counts. The punishment imposed on counts 12, 21, 22, and 23 must be stayed, as well as the punishment for the section 12022.6 enhancement appended to count 12.

### *Conclusion*

The concurrent sentences imposed on counts 2, 5, 8, 12, 21, 22, 23, and 26 should be stayed pursuant to section 654. (*Deloza, supra,* 18 Cal.4th at p. 592.) In addition, the punishment imposed for the section 12022.6 enhancements appended to counts 5, 12, and 26 also must be stayed. (*Bracamonte, supra,* 106 Cal.App.4th at p. 709.)

### III.    Abstract of Judgment

Reyes contends the abstract of judgment must be corrected as it contains errors: (1) the count 24 offense was listed erroneously as a felony and as including an enhancement, and (2) section 12022.6 enhancements were listed erroneously as appended to counts 2 and 8. The People concede these errors and also note that the abstract of judgment erroneously omits the section 12022.6 enhancement appended to count 5 and lists incorrect dates of the offenses.

Additional modifications to the abstract of judgment are required in light of our opinion. As we are remanding for resentencing, a new abstract of judgment will be prepared after resentencing. We note the following corrections:

1.  The section 12022.6 enhancements appended to counts 2 and 8 were found not true by the jury;

15.

2. The section 12022.6 enhancement appended to count 5 was found true;

3. Counts 4, 5, 7, 8, 10, 12, 21, 22, 23 and 24 were committed in 2005;

4. Counts 25 and 26 were committed in 2006;

5. The concurrent terms of imprisonment imposed on counts 2, 5, 8, 12, 21, 22, 23, and 26 should be stayed pursuant to section 654;

6. Terms imposed on the section 12022.6 enhancements appended to counts 5, 12, and 26 should be stayed pursuant to section 654;

7. The definition of the crime for count 10 should be "Conspiracy Obtaining Money, False Pretense";

8. The definition of the crime for count 25 should be "Obtain Money, False Pretense"; and,

9. The time imposed for the count 1 enhancement should indicate one (1) year.

As we are reversing count 24 for instructional error, no conviction on that count should be reflected in the abstract.

## DISPOSITION

The count 24 conviction is reversed on the grounds of instructional error. The sentence is vacated and the matter remanded for resentencing in conformance with this opinion. At resentencing, any terms of imprisonment imposed on counts 2, 5, 8, 12, 21, 22, 23, and 26, as well as the section 12022.6 enhancements appended to counts 5, 12, and 26, should be stayed pursuant to section 654.

_____
CORNELL, Acting P.J.

WE CONCUR:


_____
KANE, J.


_____
FRANSON, J.

16.