Filed 4/8/25  P. v. Gutierrez-Corral CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>LUIS GUTIERREZ-CORRAL,<br><br>        Defendant and Appellant. | A168063<br><br>(San Francisco City & County<br> Super. Ct. No. CRI-14027528) |

A jury convicted defendant Luis Gutierrez-Corral of murder and torture.  On appeal, he argues (1) substantial evidence does not support his conviction for torture; (2) substantial evidence does not support his conviction for first degree "torture-murder"; (3) the trial court failed to properly instruct the jury concerning first degree torture-murder; (4) the court erred in giving a motive instruction; (5) the court failed to instruct on the knife use enhancement; and (6) the court erred in excluding evidence of the victim's past misconduct.  We affirm.

1

## FACTUAL AND PROCEDURAL BACKGROUND

The People charged defendant and his brother, co-defendant Javier Gutierrez,[1] by amended information with murder (Pen. Code, § 187, subd. (a),[2] count 1), torture (§ 206, count 2), and assault with a deadly weapon (§ 245, subd. (a)(1), count 3) against victim Ronnie Goodman.  As to counts 1 and 2, the People alleged defendant personally used a deadly and dangerous weapon, i.e., a knife (§ 12022, subd. (b)(1) ("12022(b)(1)")).  As to count 3, the People alleged he personally inflicted great bodily injury (§ 12022.7, subd. (a)).  Beyond the foregoing, the People charged Javier alone with assault with force likely to cause great bodily injury (§ 245, subd. (a)(4), count 4), and assault with a stun gun or less lethal weapon (§ 244.5, subd. (b), count 5).

As relevant here, a jury convicted defendant of first degree murder and torture, and found the section 12022(b)(1) enhancements true as to each count.[3]  At sentencing, the trial court granted the defense's request to modify the first degree murder conviction to second degree murder.  The court sentenced defendant to a term of 15 years to life for the murder count, plus a one-year consecutive term for the knife use enhancement.  As for the torture count, the court imposed a life term, plus a one-year term for the knife use enhancement.

At trial, the evidence was undisputed that on September 9, 2014, just before or around midnight, defendant killed the victim by stabbing him 39

---

[1]    For the sake of efficiency and to avoid confusion due to shared last names, we will refer to Javier hereafter by his first name only.

[2]    All further undesignated statutory references are to the Penal Code.

[3]    Javier pleaded guilty to an amended count of involuntary manslaughter (§ 192, subd. (b), count 6) and to count 3, and admitted a great bodily injury enhancement (§ 12022.7, subd. (b)) as to count 3.

2

times. Multiple eyewitnesses observed the homicide, which took place in the street at the intersection of 24th and Capp in San Francisco.

One witness walking along 24th Street heard an escalating argument behind her and an "animal[istic] cry for help," then the dry clicking and " 'zap' " of electricity from a Taser. At the intersection of 24th and Capp, she observed two "Latinos"—later identified as defendant and Javier—attacking the victim. Defendant stabbed the victim "countless" times while the victim was standing and after he fell to the ground. The witness heard defendant repeatedly say, " 'You're dead now' " as he stabbed. The witness also indicated defendant used the "[h]ip-[h]op" version of the N-word as he stabbed.

Another witness saw the incident from an apartment overlooking the crime scene. He initially heard loud footsteps and someone yelling " '[h]elp' " in a high-pitched voice, "like a desperate plea." Then he heard an electrical crackling sound and saw two men holding and repeatedly shocking another man with a stun gun. The victim appeared helpless and was not fighting back. The victim eventually fell to the ground, and Javier kicked him while defendant was punching him. After one particular kick to the head, the victim's head snapped back, and the victim became silent and motionless. Nevertheless, defendant and Javier continued to beat him. During the incident, the witness could hear the assailants yelling something along the lines of " 'You think you can take what's mine?' " and repeatedly saying the N-word.

Another witness also saw the incident from an overlooking apartment. He initially heard people running, then someone screaming for their life and a taser going off. Looking directly below his window, the witness saw Javier tasing and kicking the victim in the head, while defendant stabbed him

3

repeatedly. During the attack, the victim did not appear to be defending himself or fighting back; he was just screaming and "seizing up." At one point, the assailants moved away from the victim, who was splayed out "spread eagled" and apparently unconscious. But after a few steps defendant came back and stabbed the victim several more times under the jaw into the neck. The witness heard defendant repeatedly say something like, " 'This is what you get [N-word].' "

The medical examiner who performed the autopsy testified the victim died despite receiving "extreme life saving measures." The victim had 39 "sharp force" injuries, along with other blunt force injuries. The sharp force injuries included both deep stab wounds and "incised" wounds that were longer along the skin than they were deep. The victim had stab and incised wounds to his head, neck, back, chest, abdomen, arms, and hands, and the sharp force injuries on the back of his forearms and hands were consistent with being defensive wounds. One stab wound severed the victim's carotid artery, and another penetrated his chest cavity and punctured his lung. Yet another punctured his liver. The victim's left eyeball and right eyelid each had an incised wound. The stab wounds were the cause of death.

The testimony of San Francisco Police Captain Chris Canning included the following. Surveillance video of the suspects' flight path led the police to identify defendant as a suspect, and police seized knives and a stun gun from his apartment. During an interview, defendant told Captain Canning shifting stories about what happened, but he ultimately admitted to stabbing the victim. Defendant described two interactions with the victim. In the first incident, defendant exited a bus at around 10:30 p.m. when a person who he described as a "Latino" teenager (this was the victim's friend, Marcelus R.) said "west side" and a two-digit number, then put his hands up to fight.

4

Defendant thought the teenager was trying to play the "knockout game" to be "Worldstar famous." After the teenager swung with a fist and grazed his cheek, defendant hit and knocked him down. The teenager either ran or chased him for a bit, but defendant went home in a taxi. Later in the interview, defendant indicated the victim was with the teenager, egging him on. During this first encounter, defendant made sure the victim and the teenager saw he had a knife.

At home, defendant told his brother some "little kid" tried to jump him, and they went out and found them. The victim and the teenager tried to swing bottles at defendant, but they dropped them and the bottles broke. Both the teenager and the victim ran off, but defendant chased the victim down and stabbed him. Defendant believed this was justified because the two had tried to jump him, and the victim tried to have him jumped years before. Defendant identified the knife that he used and said he stabbed the victim around 30 times until he was dead. With his final breath, the victim said, " 'I forgot to tell you I love you,' " to which defendant responded " 'fuck you [N-word].' " After stabbing the victim in the chest and throat, defendant stabbed him in the eyes, in order to "[t]ake them out" and make sure the victim would not come back for him. If defendant could do it over again, he would have killed the teenager instead of the victim, and just beat up the victim, like by "snapp[ing] the spine or something."

Defendant took the stand and gave his version of what happened during the two incidents with the victim. Though details varied from his earlier statements to Captain Canning, he admitted that he stabbed the victim 39 times, and in areas where vital organs are located, but denied that he wanted to kill or cause pain. He continued to stab the victim, who was trying to defend himself and had fallen to the ground, because he was not

5

sure if the victim still posed a threat. Despite what he said during his police interview, defendant testified he stabbed the victim in the eyes unintentionally while wildly swinging. He denied stabbing the victim to retaliate against him or as revenge for him participating in Marcelus R.'s earlier assault on 23rd and Mission. He believed the victim remained a threat even after the thirtieth time that he stabbed him. Defendant did not know if the victim's aggression against him was gang-motivated, though he indicated the victim was not wearing colors that reflected a gang affiliation.

The defense introduced evidence concerning defendant's mental health, including evidence that in October 2014, after his arrest for the instant killing, jail behavioral health services staff noted that defendant presented with grandiose delusions and cannabis dependence. Staff recommended that he be monitored by the stabilization team and have a "psych code" to alert correctional officers that he could be experiencing mental health issues. Dr. Jeffrey Gould, an expert in forensic psychiatry, testified that defendant's medical records indicated he was having delusions in late 2014, and seemed to be worsening by mid-2015, at which point he was given antipsychotic medications and improved. Dr. Gould conducted a psychiatric evaluation of defendant in 2019 and diagnosed him with schizophrenia spectrum and other psychotic disorder. In October 2020, after defendant stopped taking his medications, defendant was admitted to an inpatient psychiatric unit pursuant to Welfare and Institutions Code section 5150, and his psychotic symptoms became severe.

The People called Dr. Mikel Matto as a rebuttal witness. Dr. Matto diagnosed defendant with schizophrenia in 2022. He testified that in September 2014, at the time of the offense, defendant had "unspecified schizophrenia spectrum and other psychotic disorders," meaning he had some

6

symptoms of schizophrenia, but did not meet all the criteria for a schizophrenia diagnosis. Dr. Matto believed defendant did not have his psychotic " 'first break' " until months after crime.

DISCUSSION

### A. Substantial Evidence of Torture (§ 206)

Defendant contends the evidence was insufficient to support the mental state element required for his torture conviction. In making this argument, he points to the duration of the attack and to the number and nature of the stab wounds, which he suggests were indicative of " 'animal fury,' " rather than the specific intent required for torture.

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Section 206 provides: "Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture. [¶] The crime of torture does not require any proof that the victim suffered pain."

"Torture has two elements: '(1) the infliction of great bodily injury on another; and (2) the specific intent to cause cruel or extreme pain and suffering for revenge, extortion or persuasion or any sadistic purpose.' " (*People v. Burton* (2006) 143 Cal.App.4th 447, 451–452 (*Burton*).) Here, it is

uncontested that defendant inflicted great bodily injury. As such, we will focus on the mental state element.

"Courts have interpreted intent to inflict 'cruel' pain and suffering as intent to inflict extreme or severe pain. [Citation.] Absent direct evidence of such intent, the circumstances of the offense can establish the intent to inflict extreme or severe pain." (*Burton*, *supra*, 143 Cal.App.4th at p. 452.) In determining whether the defendant acted with the intent to torture, " 'the jury may of course consider all the circumstances surrounding the killing. Among those circumstances, in many cases, is the severity of the victim's wounds.' " (*People v. Mincey* (1992) 2 Cal.4th 408, 433.) "[T]he severity of a victim's wounds is not necessarily determinative of intent to torture," and because severe wounds may result from "an explosion of violence [citation] or an 'act of animal fury,' " the nature of the victim's wounds and condition of the victim's body may or may not establish "circumstantial evidence of the requisite intent." (*Id.* at pp. 432–433.) For example, " 'scarring and disfigurement constitute strong circumstantial evidence of intent to inflict severe pain and suffering.' " (*Burton*, at p. 452.) An intent to cause extreme pain may also be inferred where a defendant "focuses his attack on a particularly vulnerable area." (*Ibid.*) "On the other hand, if the jury believes the accused acted in such a mindless rage that thought processes were impossible, then it may conclude he did not harbor the intent to inflict injury. The proper inferences to be drawn are the province of the jury and not an appellate court." (*People v. Massie* (2006) 142 Cal.App.4th 365, 372 (*Massie*).)

Here, there was ample evidence supporting the jury's determination that defendant acted with the requisite mental state for torture. Defendant admitted he stabbed the victim 39 times, including in vulnerable areas, such as his face, neck, eyes, and body parts with or near vital organs. The wounds

8

were unquestionably severe: defendant severed the victim's carotid artery and punctured his aorta; punctured his lung and liver; and cut into the left eyeball. Medical staff took "extreme" life saving measures but the victim was pronounced dead shortly after the attack.

Moreover, defendant testified he continued to stab the victim though the victim tried to block the blows with his arms. And three eyewitnesses saw the attack continue while the victim desperately screamed for help, and even after the victim lay motionless on the ground. One eyewitness heard defendant repeatedly say, "You're dead now, [N-word]," in a dry or matter-of-fact way, while stabbing the victim as the victim's "life force" was draining. Another eyewitness testified that, though defendant left the scene momentarily, he returned to again stab the victim—who was "spread eagled" and "completely vulnerable" on the ground—several more times under the jaw into the neck while saying, " 'This is what you get [N-word].' "

In addition, defendant indicated, both in his testimony and in his statements to the police, that he sought to punish the victim. That is, before the second encounter, he and his brother armed themselves and went looking for the victim and his teenage friend because they had previously tried to "jump[]" defendant. Defendant also testified that in high school, the victim seemed to be trying to get a gang member to beat defendant up.

On this record, there was substantial evidence supporting the jury's finding that defendant acted with the specific intent to cause cruel or extreme pain and suffering for revenge or a sadistic purpose.

Defendant's reliance on the fight's supposedly brief duration is unavailing. Though defendant characterizes the attack as lasting anywhere from two to five minutes, one eyewitness testified it lasted about eight minutes. In any event, even assuming the attack lasted only two minutes,

9

the duration of the incident is just one circumstance to consider and "the brevity of the attack does not, in and of itself, compel a conclusion the defendant must be acquitted of torture." (*People v. Pre* (2004) 117 Cal.App.4th 413, 420 (*Pre*).) Here, the jury made its decision after considering all of the evidence, and it is not our role to reweigh it.

We are also unpersuaded by defendant's reliance on *People v. Anderson* (1965) 63 Cal.2d 351, *People v. Tubby* (1949) 34 Cal.2d 72 (*Tubby*), and *People v. Bender* (1945) 27 Cal.2d 164 (*Bender*). The facts in those cases do not compel a reversal on the facts of this case. (See *Anderson*, at pp. 355–356, 358–360; *Tubby*, at pp. 74–75, 77–78; *Bender*, at pp. 168–173.) We see "little utility in looking to the facts of other torture cases when faced with assessing the sufficiency of the evidence." (*Pre*, *supra*, 117 Cal.App.4th at p. 423, and cases cited.)

In sum, we reject defendant's contention that insufficient evidence supported his conviction for torture.

### B.  Murder (§ 189)

Defendant next contends his conviction for first degree murder under section 189 is unsupported.[4] Claiming he was convicted of first degree murder "by means of" torture—as opposed to first degree *felony murder*

---

[4]      At sentencing, the trial court reduced the first degree murder conviction to second degree murder. The court discussed numerous aspects of the offense and of defendant, particularly his late onset of undiagnosed mental illness, then apparently agreed with defendant that punishment for first degree murder would be grossly disproportionate to the culpability of the individual offender and the circumstances of the offense. (*People v. Dillon* (1983) 34 Cal.3d 441, 478–479.) In light of this reduction, the People argue defendant's challenges to his conviction for first degree murder are moot. However, if defendant's challenges have merit, reversal of the entire murder conviction would appear in order. Accordingly, we will address the merits of defendant's claims.

10

during the commission of torture—defendant asserts the evidence was insufficient to support the heightened mental state required for the crime, namely "a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain on a person for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose." (*People v. Edwards* (2013) 57 Cal.4th 658, 715–716 (*Edwards*).) In making this argument, defendant insists torture is "not one of [section 189's] enumerated felony-murder offenses." Relatedly, he contends the trial court failed to instruct the jury on this heightened mental state, thereby depriving him of his right to a jury determination of that element.

In assessing defendant's contentions, we first determine whether torture qualifies as one of section 189's enumerated felony-murder offenses, and if so, whether a conviction under this theory requires something more than proof of a killing that occurs during the commission of torture plus specific intent to commit torture. These are questions of law that we review de novo, and we begin with a discussion of section 189 and the different theories for first degree murder.

### 1. Legal Background

Prior to 1990, section 206—which defines the crime of torture—did not exist. (*People v. Hale* (1999) 75 Cal.App.4th 94, 107 (*Hale*).) That said, section 189 has long provided: " 'All murder which is perpetrated *by means of* poison, or lying in wait, *torture,* or by any other kind of willful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, or mayhem, is murder of the first degree; and all other kinds of murder are of the second degree." (*Bender, supra,* 27 Cal.2d at p. 180, italics added.) Under section 189, the crime of murder "by means of" torture contains the following elements:

11

"(1) an act or acts causing death that involve a high degree of probability of death, (2) a causal relationship between the torturous act and death, (3) a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain on a person for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose, and (4) commission of the act or acts with such intent." (*Edwards, supra*, 57 Cal.4th at pp. 715–716.) This mental state for murder by means of torture is well settled. (See *People v. Steger* (1976) 16 Cal.3d 539, 546 (*Steger*).)

In 1990, the passage of a ballot initiative added section 206 to the Penal Code, which established the crime of torture. (§ 206, added by initiative, Primary Elec. (June 5, 1990), commonly known as Prop. 115.) Section 206 was intended to " 'fill[] a gap in existing law dealing with extremely violent and callous criminal conduct.' " (*Hale, supra*, 75 Cal.App.4th at p. 107.) "[F]or purposes of section 206, torture has two elements: (1) the infliction of great bodily injury; and (2) the specific intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (*Massie, supra*, 142 Cal.App.4th at pp. 370–371.) But unlike the intent required for murder by means of torture, torture under section 206 "does not require the defendant [to] act with premeditation and deliberation" or with the intent "to inflict prolonged pain." (*Massie*, at p. 371.) Thus, the intent required for torture under section 206 "is not identical" to the intent required for murder by means of torture under section 189. (*Massie*, at p. 372.)

In 1999, Assembly Bill No. 1574 added torture to section 189's list of predicate offenses for first degree felony murder. (Stats. 1999, ch. 694, § 1; *People v. Pearson* (2012) 53 Cal.4th 306, 319 (*Pearson*); see Legis. Counsel's Dig., Assem. Bill No. 1574, Stats. 1999, ch. 694 (1999–2000 Reg. Sess.).)

Thus, section 189 presently provides: "All murder that is perpetrated *by means of . . . torture*, or by any other kind of willful, deliberate, and premeditated killing, ***or*** *that is committed in the perpetration of, or attempt to perpetrate . . . any act punishable under Section 206 . . .* is murder of the first degree." (Italics and boldface added.) By its terms, section 189 clearly reflects that "[t]orture as a predicate for first degree felony murder is distinct from first degree murder as a killing 'perpetrated by means of . . . torture.' " (*Pearson*, at p. 319, fn. 3.)

In sum, section 189 currently codifies alternative ways in which one can commit first degree murder involving torture.

### 2. *Analysis*

As mentioned, defendant contends torture is not a predicate offense for first degree felony murder. Defendant is wrong. The plain language of section 189 establishes that torture in violation of section 206 is a predicate offense for first degree felony murder. (*Pearson*, *supra*, 53 Cal.4th at p. 319; *People v. Brothers* (2015) 236 Cal.App.4th 24, 31 (*Brothers*) ["If the underlying felony is one specifically identified in section 189, such as torture, . . . the resulting homicide is murder in the first degree"].) Even if there were some doubt, the legislative history of Assembly Bill No. 1574 confirms its amendment of section 189 "expand[s] the felony murder rule to include torture and thereby provide that a murder, which occurs when a person had the intent to torture, but no premeditation to kill, is first degree murder." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1574 (1999–2000 Reg. Sess) Sept. 2, 1999, p. 1; see Sen. Com. on Pub. Safety, Analysis of Assem. Bill No. 1574 (1999–2000 Reg. Sess) July 13, 1999, p. 2 ["This bill adds any murder committed during torture to the list of specified murders that constitute first degree felony murder."].)

13

Next, we examine defendant's assertion that he was prosecuted and convicted of first degree murder "by means of" torture, and not first degree felony murder based on torture. Having independently reviewed the record, we cannot agree. Among other things, the record shows the trial court gave CALCRIM No. 548, which instructed that defendant was being prosecuted on two theories of murder: (1) murder with malice aforethought (see CALCRIM Nos. 520, 521), and (2) felony murder during the commission of torture (see CALCRIM No. 540A). Consistent with CALCRIM No. 520, the jury was told: "If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM No[s]. 521 and 540A."

The trial court then instructed the jury with CALCRIM No. 521, which included the statement that defendant "is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation," as well as additional comments describing conduct that could be considered willful, deliberate, and premeditated. But this instruction contained no reference to torture; nor did defendant request its modification to include first degree murder by means of torture.

Thereafter, and without the defense's objection, the trial court gave CALCRIM No. 540A—the standard instruction for first degree felony murder under section 189—that defendant was charged with murder under a theory of "first degree *felony murder*." This instruction informed the jury that "[t]o prove that the defendant is guilty of first degree murder under this theory, the People must prove that: [¶] 1. The defendant committed the crime of Torture; [¶] 2. The defendant specifically intended to commit the crime of Torture; [¶] AND [¶] 3. While committing the crime of Torture, the defendant caused the death of another person. [¶] A person who was the

14

actual killer may be guilty of felony murder even if the killing was unintentional, accidental, or negligent. [¶] To decide whether the defendant committed the crime of Torture, please refer to the separate instruction that I will give you for that crime (Instruction 810). You must apply that instruction when you decide whether the People have proved first degree murder under a theory of felony murder. [¶] The defendant must have intended to commit the felony of torture before or at the time that he caused the death." (Italics added.) Not surprisingly, defense counsel acknowledged he was on notice that the prosecutor was proceeding on a first degree felony-murder theory with torture as the predicate felony. And importantly, the prosecutor made clear during closing argument he was pursuing a murder conviction on a theory of felony murder based on torture.

Having determined that torture is a predicate offense for first degree felony murder in section 189 and that defendant was prosecuted under this theory, we turn to address defendant's contention that his murder conviction cannot stand because the trial court did not instruct, and the evidence was insufficient to establish, that he acted with the heightened mental state required for first degree murder "by means of" torture, namely, "a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain on a person for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose."

We have no quarrel with the proposition in *Edwards*, *supra*, 57 Cal.4th 658 that murder perpetrated "by means of" torture, as set out in section 189's first category of first degree murders, requires "a willful, deliberate, and premeditated intent to inflict extreme and prolonged pain on a person for the purpose of revenge, extortion, persuasion, or for any other sadistic purpose." (*Edwards*, at pp. 715–716.) As indicated, however, case law is clear that a

15

first degree felony murder based on torture as a predicate offense "is distinct from" a first degree murder by means of torture. (*Pearson*, *supra*, 5 Cal.4th at p. 319, fn. 3.)

Indeed, it is well established that "the mental state required for felony murder is ' "the specific intent to commit the underlying felony" ' [citation], and ' "the evidence must establish that the defendant harbored the felonious intent either prior to or during the commission of the acts which resulted in the victim's death." ' " (*People v. Brooks* (2017) 3 Cal.5th 1, 61; see *Brothers*, *supra*, 236 Cal.App.4th at p. 31 ["If the underlying felony is one specifically identified in section 189, such as torture," a homicide that results from a defendant acting with the specific intent to commit torture "is murder in the first degree"].) As the legislative history discloses, the Legislature's enactment of Assembly Bill No. 1574 sought to eliminate "the current requirements of premeditation and deliberation and intent to cause prolonged pain for first-degree torture murder." (Assem. Com. on Appropriations, Analysis of Bill No. 1574 (1999–2000 Reg. Sess.) Apr. 28, 1999, p. 1.) In this regard, the Legislature's subsequent passage of Senate Bill No. 1437 did not add a "heightened mental state requirement for the 'actual killer' prosecuted under a felony-murder theory." (*People v. Garcia* (2022) 82 Cal.App.5th 956, 967.)

Defendant does not point to any authority indicating the heightened mental state referenced in *Edwards* is an element of first degree *felony murder* by torture. Rather, defendant's cases simply recognize that the mental state described in *Edwards* for murder perpetrated "by means of" torture and other crimes falling within section 189's first category of first degree murder may be proved by evidence establishing " 'the functional equivalent of proof of premeditation, deliberation and intent to kill.' " (*People*

16

*v. Brown* (2023) 14 Cal.5th 453, 471; see *Edwards*, *supra*, 57 Cal.4th at pp. 715–716; *Steger*, *supra*, 16 Cal.3d at pp. 545–546; *Tubby*, *supra*, 34 Cal.2d at pp. 76–77; *People v. Heslen* (Cal. 1945) 163 P.2d 21, 26–27.)

In response to our request for supplemental briefing on the application of felony-murder principles in this case, defendant concedes torture is a predicate offense for first degree felony murder under section 189, and he acknowledges the People prosecuted him under such a theory. But he belatedly argues for the first time that the heightened mental state set out in *Edwards* nonetheless applies because torture is an "assaultive" crime and therefore the "merger doctrine" set out originally in *People v. Ireland* (1969) 70 Cal.2d 522 would preclude a felony-murder conviction in this case. This is meritless. The merger doctrine provides that "when the underlying felony is assaultive, such as the willful discharge felony in Penal Code section 246.3, that felony always 'merges with the homicide' and cannot support a felony-murder conviction." (*In re Ferrell* (2023) 14 Cal.5th 593, 601.) But the California Supreme Court has long held that the merger doctrine applies only to *second degree* felony murder; it does not apply to *first degree* felony murder under section 189. (*People v. Powell* (2018) 5 Cal.5th 921, 942–944 (*Powell*); *People v. Farley* (2009) 46 Cal.4th 1053, 1118–1120 (*Farley*).)

Additionally, defendant's supplemental brief points to a bench note in CALCRIM No. 540A that omits mention of torture for felony murder: "The felonies that support a charge of first degree felony murder are arson, rape, carjacking, robbery, burglary, kidnapping, mayhem, train wrecking, sodomy, lewd or lascivious acts on a child, oral copulation, and sexual penetration. (See Pen. Code, § 189.)" (Judicial Council of Cal., Crim. Jury Instns. (2024) Bench Notes to CALCRIM No. 540A.) No matter. As explained, Assembly Bill No. 1574 indisputably added torture to section 189's list of predicate

17

offenses for first degree felony murder. (See 6 Millman, Sevilla & Tarlow, Cal. Criminal Defense Practice, Ch. 142, *Crimes Against the Person*, § 142.01[2][a][v] ["for any prosecution for a torture-murder committed on or after January 1, 2000, two alternate torture-murder theories could be argued by the prosecution: one, as discussed above, and the other, as a felony-murder not requiring malice"]; see also 1 Witkin, California Criminal Law (5th ed. 2024) *Crimes Against the Person*, § 57, pp. 836–837.) Thus, to the extent the bench note to CALCRIM No. 540A appears contrary to section 189, it carries no weight. (See *People v. Morales* (2001) 25 Cal.4th 34, 48, fn. 7 [jury instructions "are not themselves the law, and are not authority to establish legal propositions or precedent"]; *Farley, supra*, 46 Cal.4th at p. 1119 [power to define crimes "is vested exclusively in the legislative branch"].) We also note this bench note has been in CALCRIM No. 540A since 2006 and predates *Edwards* and *Brown*, the cases on which defendant primarily relies for the proposition that a heightened mental state element applies to first degree felony murder by torture. Thus, *Edwards* and *Brown* could not have been the source of the bench note.

The felony-murder instruction given in this case is similar to the felony murder by torture instruction approved by the California Supreme Court in *People v. Hardy* (2018) 5 Cal.5th 56, which stated: " 'The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs during the commission of any of the following crimes: robbery, kidnap for rape, rape in concert, rape, sexual penetration by a foreign object in concert, sexual penetration by a foreign object *or torture, is murder of the first degree when the perpetrator had the specific intent to commit that crime.* The specific intent to commit any of the following crimes: robbery, kidnap for rape, rape in concert, rape, sexual penetration by a foreign object (a wooden

18

stake) in concert, sexual penetration by a foreign object (a wooden stake) *or torture* and the commission of any such crime must be proved beyond a reasonable doubt.' " (*Hardy*, at pp. 91–92, italics added.)  Though *Hardy* did not directly address whether the heightened mental state described in *Edwards* applies to this form of murder, the opinion, at least in dicta, supports our conclusion.

*Powell*, *supra*, 5 Cal.5th 921 does not compel a different conclusion. There, the California Supreme Court discussed the fact that the jury was instructed on felony murder by mayhem and torture, then recounted standard felony-murder doctrine:  " ' "The felony-murder rule makes a killing while committing certain felonies murder without the necessity of further examining the defendant's mental state." [Citation.]  "Under the felony-murder doctrine, when the defendant or an accomplice kills someone during the commission, or attempted commission, of an inherently dangerous felony, the defendant is liable for either first or second degree murder, depending on the felony committed.  If the felony is listed in section 189, the murder is of the first degree; if not, the murder is of the second degree." ' " (*Powell*, at p. 942.)  Though this discussion lends support to our conclusion, we acknowledge a caveat.  Namely, the *Powell* court separately analyzed the sufficiency of the evidence of the "first degree torture-murder conviction" using the elements for the crime set out in *Edwards*.  (*Id*. at p. 944.)  It is unclear whether the defendant was prosecuted under a theory of first degree murder "by means of" torture as well as first degree felony murder based on torture, and there is no indication whether the court was asked to consider, or did consider whether the mental state described in *Edwards* must be shown for first degree felony murder based on torture.  Ultimately, " ' "cases are not authority for propositions not considered" ' " (*B.B. v. County of Los*

19

*Angeles* (2020) 10 Cal.5th 1, 11), and because we cannot discern any clear ruling from *Powell* on the issue at hand, we reach our own conclusion.

In sum, we conclude the heightened mental state referenced in *Edwards* was not an element of the first degree felony-murder charge at issue in this case. Accordingly, we reject defendant's contentions that the trial court failed to instruct the jury on the matter and that insufficient evidence supported this element.

## C. Instruction on Motive

The trial court instructed with CALCRIM No. 370, which told the jury that "[t]he People are not required to prove that a defendant had a motive to commit any of the crimes charged. In reaching your verdict you may, however, consider whether a defendant had a motive. [¶] Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show the defendant is not guilty." It does not appear that defendant objected to this instruction.

The jury was also instructed with CALCRIM No. 810 regarding torture: "To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant inflicted great bodily injury on someone else; [¶] AND [¶] 2. When inflicting the injury, the defendant intended to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose."

Defendant now contends the trial court erred by instructing the jury with CALCRIM No. 370 because the crimes of torture and murder "by means of" torture, both require a motive, i.e., infliction of pain *for the purpose of* revenge, extortion, persuasion, or any sadistic purpose. He contends the instructional error deprived him of his right to a jury determination of guilt

20

by proof beyond reasonable doubt.  We review this claim of instructional error de novo.  (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

Case law does not support defendant's contention.  One case examining this issue specifically held that "motive is not an element of the crime of torture."  (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1452.)  And though the jury was not instructed to consider defendant's guilt of first degree murder "by means of" torture under the first part of section 189, we observe that motive is not an element for that crime, either.  Specifically, even though both torture and murder by means of torture require the infliction of pain *for the purpose* of revenge, extortion, persuasion, or for any other sadistic purpose, the language of that requirement does not elevate motive to the status of an element.  (*People v. Lynn* (1984) 159 Cal.App.3d 715, 728; see *People v. Whisenhunt* (2008) 44 Cal.4th 174, 218 ["a trial court does not err in instructing the jury that motive is not an element of murder by torture"].)  As the California Supreme Court has explained, " '[m]otive describes the reason a person chooses to commit a crime.  The reason, however, is different from a required mental state such as intent or malice.' "  (*Whisenhunt*, at p. 218.)  On the strength of these authorities, we reject defendant's argument.

### D.  Section 12022(b)(1) Enhancement

Defendant was charged with personally using a deadly or dangerous weapon, a knife, in the commission of the murder and torture counts pursuant to section 12022(b)(1).  Section 12022(b)(1) provides a one-year consecutive sentencing enhancement when a person "[1] personally uses [2] a deadly or dangerous weapon [3] in the commission of a felony or attempted felony."  It is undisputed that the trial court did not specifically instruct the jury concerning the section 12022(b)(1) allegations and that no party objected.

Despite this instructional error, the jury returned verdict forms finding true the allegations that defendant "personally used a knife in the commission of" the murder and torture felony counts. Prior to sentencing, the apparently inadvertent omission was discovered. At sentencing, the court indicated it would sentence defendant on the enhancements, because defendant failed to object to the omitted instruction and because no rational jury would have found the allegations not true given the overwhelming evidence in the case.

Citing *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), defendant argues on appeal that the instructional error violated his right to a jury determination on the section 12022(b)(1) allegations. The People concede the error. We accept that concession.

"In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." (*People v. Martinez* (2010) 47 Cal.4th 911, 953.) That sua sponte obligation includes giving instructions on the elements of an alleged enhancement, such as the enhancement set out in section 12022(b)(1). (*People v. Wims* (1995) 10 Cal.4th 293, 303, overruled on other grounds as stated in *People v. Sengpadychith* (2001) 26 Cal.4th 316, 325–326 (*Sengpadychith*).) A court errs if it fails to instruct on the elements necessary to prove a section 12022(b)(1) enhancement. (*Wims*, at p. 303.) "[N]o objection is required to preserve a claim for appellate review that the jury instructions omitted an essential element of the charge." (*People v. Mil* (2012) 53 Cal.4th 400, 409 (*Mil*).) The failure to instruct on the elements of an enhancement is a serious constitutional error that threatens the federal and state right to a

jury trial.  (*People v. Merritt* (2017) 2 Cal.5th 819, 824 (*Merritt*).)  The question then becomes:  is the error amenable to harmless error analysis?

Defendant offers no argument on the amenability of the error to harmless error review.  The People contend the test for federal constitutional error set out in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) applies and the error was harmless under that standard.  Whether the error is amenable to harmless error review is a question of law that we review de novo.

### 1.  Governing Law

We turn first for guidance from the United States Supreme Court.  In *Washington v. Recuenco* (2006) 548 U.S. 212 (*Recuenco*), the State of Washington charged defendant with "assault in the second degree, i.e., 'intentiona[l] assault . . . with a deadly weapon, to-wit: a handgun.' " (*Recuenco*, at p. 215.)  The jury was presented with a special verdict form directing it to find whether the defendant was " 'armed with a deadly weapon at the time of the commission of the crime,' " but the verdict form did not require the jury to find that the defendant had engaged in assault with a firearm as opposed to another kind of deadly weapon.  The jury found the defendant guilty of second degree assault, and found he was armed with a deadly weapon.  At sentencing, the State sought the low term for second degree assault.  But rather than requesting the one-year enhancement that would attend the jury's finding that the defendant was "armed with a deadly weapon," the State sought a mandatory three-year enhancement because the defendant was "armed with a 'firearm.' "  The trial court sentenced the defendant on the firearm enhancement.  (*Ibid.*)

While the appeal was pending, the United States Supreme Court issued its decisions in *Apprendi*, *supra*, 530 U.S. 466 and *Blakely v.*

23

*Washington* (2004) 542 U.S. 296, which *Recuenco* viewed as together standing for the proposition that " '[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt,' " with the understanding that the "statutory maximum" in this context is " 'the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*' " (*Recuenco*, *supra*, 548 U.S. at p. 216.)  After the State of Washington conceded error under *Apprendi* and *Blakely*, the Washington Supreme Court concluded the error was structural and refused to apply a harmless error test. (*Ibid.*)

The United States Supreme Court reversed the state high court, holding:  "Failure to submit a sentencing factor to the jury, like failure to submit an element to the jury, is not structural error."  (*Recuenco*, *supra*, 548 U.S. at p. 222.)  The court indicated the case was indistinguishable from *Neder v. United States* (1999) 527 U.S. 1 (*Neder*), which previously held that harmless-error analysis applied to the failure to instruct on an element of an offense.  (*Recuenco*, at p. 220.)  *Recuenco* explained:  "Our decision in *Apprendi* makes clear that '[a]ny possible distinction between an "element" of a felony offense and a "sentencing factor" was unknown to the practice of criminal indictment, trial by jury, and judgment by court as it existed during the years surrounding our Nation's founding.' [Citation.]  Accordingly, we have treated sentencing factors, like elements, as facts that have to be tried to the jury and proved beyond a reasonable doubt.  [Citation.]  The only difference between this case and *Neder* is that in *Neder*, the prosecution failed to prove the element of materiality [(an element of the charged crimes)] to the jury beyond a reasonable doubt, while here the prosecution failed to

24

prove the sentencing factor of 'armed with a firearm' to the jury beyond a reasonable doubt." (*Recuenco*, at p. 220.)

Recent California Supreme Court cases are also instructive. In *Mil*, *supra*, 53 Cal.4th 400, the jury was instructed on felony-murder special circumstances that "the People had the burden of proving the truth of the special circumstances beyond a reasonable doubt," "that the jury must agree unanimously," and that the special circumstances required proof that " 'the murder was committed while the defendant was engaged in the commission or attempted commission of a robbery or a burglary.' " (*Mil*, at p. 409.) Notably, the trial court failed to instruct that a nonkiller must "(1) have personally had the intent to kill or (2) have been a major participant in the commission of the burglary or robbery and have acted with reckless indifference to human life." (*Ibid.*) But even though the error in omitting these elements of the special circumstance allegations prevented the jury from rendering a " 'complete verdict' " in violation of the state and federal Constitutions, the California Supreme Court concluded the error was amenable to harmless error analysis under *Chapman*, and was not reversible per se. (*Mil*, at p. 411.)

The *Mil* court explained: "The high court has 'repeatedly recognized that the commission of a constitutional error at trial alone does not entitle a defendant to automatic reversal.' [Citation.] *An error is ' "structural," and thus subject to automatic reversal, only in a "very limited class of cases," ' such as the complete denial of counsel, a biased decision maker, racial discrimination in jury selection, denial of self-representation at trial, denial of a public trial, and a defective reasonable-doubt instruction.* (*Neder, supra*, 527 U.S. at p. 8.) *What unites this class of errors is 'a "defect affecting the framework within which the trial proceeds, rather than simply an error in the*

*trial process itself."* . . . *Put another way, these errors deprive defendants of "basic protections" without which "a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair."* ' [¶] If, on the other hand, ' "the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error  analysis." ' (*Neder, supra,* 527 U.S. at p. 8.) '[W]hile there are some errors to which *Chapman* does not apply, they are the exception and not the rule.' " (*Mil, supra,* 53 Cal.4th at p. 410, italics added.)[5]

The *Mil* court went on to say: "The critical inquiry, in our view, is not the *number* of omitted elements but the *nature* of the issues removed from the jury's consideration. Where the effect of the omission can be 'quantitatively assessed' in the context of the entire record (and does not otherwise qualify as structural error), the failure to instruct on one or more elements is mere ' "trial error" ' and thus amenable to harmless error review." (*Mil, supra,* 53 Cal.4th at pp. 413–414.) The court, however, also observed: "the omission of one or more elements of a charged offense or special

---

[5]     After *Apprendi,* the California Supreme Court decided that failure to instruct on an element of a criminal street gang sentencing enhancement was subject to harmless error review (1) under *Chapman* where the enhancement increased the maximum possible penalty for the underlying crime, and (2) under *Watson* for offenses carrying life terms, insofar as the enhancement does not increase the maximum possible penalty for the underlying crime and so does not implicate *Apprendi.* (*Sengpadychith, supra,* 26 Cal.4th at pp. 324–327.)

Though the instant crimes of murder and torture require imposition of indeterminate terms (§§ 190, 206.1), we do not ignore *Sengpadychith.* We select the *Chapman* test below because this area of the law continues to develop, and if *Chapman* is satisfied, then the test for state law harmless error set out in *Watson* will also be.

26

circumstance allegation is amenable to review for harmless error under the state and federal Constitutions, *at least as long as the omission 'neither wholly withdrew from jury consideration substantially all of the elements . . . , nor so vitiated all of the jury's findings as to effectively deny defendant[] a jury trial altogether.' "* (*Id.* at p. 415, italics added.)

Put another way, "the more elements that are omitted, the less likely it is that the error is harmless, but so long as the error does not vitiate *all* of the jury's findings, it is amenable to harmless error analysis." (*Merritt, supra,* 2 Cal.5th at p. 829 [court's failure to instruct on most of the elements of robbery amenable to harmless error in view of other instructions given and closing arguments].) This stands in contrast with instructional errors that are not amenable to harmless error analysis because they " ' "vitiate[] *all* the jury's findings" ' " and " ' "produce[] consequences that are unnecessarily unquantifiable and indeterminate." ' " (*Id.* at p. 826.)

In assessing application of the *Chapman* harmless error analysis here, we are guided by case law holding that "the adequacy of the jury charge must be determined from the entirety of the charge, not from a single instruction. [Citation.] Jury instructions must be read together and understood in context as presented to the jury. [Citation.] . . . Jurors are presumed to be intelligent people, capable of understanding and correlating all instructions." (*People v. Ayers* (2005) 125 Cal.App.4th 988, 997 (*Ayers*).)

### 2. *Analysis*

Though the jury here did not receive instructions specifically directed at the section 12022(b)(1) allegations, the trial court did instruct that "[a] defendant in a criminal case is presumed to be innocent. This presumption requires that the People prove a defendant guilty beyond a reasonable doubt. Whenever I tell you the People must prove something, I mean they must

27

prove it beyond a reasonable doubt unless I specifically tell you otherwise." The court also instructed that "[s]ome words or phrases used during this trial have legal meanings that are different from their meanings in everyday use. These words and phrases will be specifically defined in these instructions. . . . Words and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings." The court also instructed the jury it was required to follow the law as instructed by the court.

Considering the instructions as a whole, we are satisfied the jurors understood that the section 12022(b)(1) allegations must be found true beyond a reasonable doubt. As indicated, the jurors were told that defendants are presumed innocent, that guilt must be proved beyond a reasonable doubt unless there was some contrary instruction, and that a defendant is entitled to an acquittal unless the evidence proves the defendant guilty beyond a reasonable doubt. These instructions were reinforced by defense counsel's closing argument that whenever the People "need to prove something, it needs to be by this high standard beyond a reasonable doubt." Moreover, there were no instructions and no arguments mentioning an alternative burden of proof. Under these circumstances, sensible jurors would reasonably have understood that the section 12022(b)(1) allegations had to be proved beyond a reasonable doubt. (*Ayers, supra,* 125 Cal.App.4th at p. 997.)

Nonetheless, it remains the case that no instruction specifically explained the elements of the section 12022(b)(1) enhancement, such as the definition of "deadly or dangerous weapon" and "personal use." For example, had the trial court given CALCRIM No. 3145 (the standard instruction on a section 12022(b)(1) enhancement), the jurors would have been instructed that someone personally uses a deadly or dangerous weapon if they intentionally

28

display the weapon in a menacing manner or hit someone with it. They also would have been instructed that a deadly or dangerous weapon is "any object, instrument, or weapon . . . that is used in such a way that it is capable of causing and likely to cause death or great bodily injury," and that all circumstances should be considered in deciding whether an object is a deadly weapon.[6] (Italics and brackets omitted.)

Was this instructional omission amenable to harmless error analysis? We start by reiterating *Merritt*'s holding that "the more elements that are omitted, the less likely it is that the error is harmless, but so long as the error does not vitiate *all* of the jury's findings, it is amenable to harmless error analysis." (*Merritt*, *supra*, 2 Cal.5th at p. 829.)

In our view, the trial court's omission did not produce consequences that were necessarily unquantifiable and indeterminate so as to vitiate all the jury's findings. (See *Merritt*, *supra*, 2 Cal.5th at p. 826.) As the record reflects, the verdict forms instructed the jurors that after finding defendant guilty of murder and torture, they could then find true the additional section 12022(b)(1) allegation that "defendant personally used a knife in the commission of the above offense." In other words, the verdict forms informed the jurors of the elements of personal use while "in the commission of" the murder and torture offense, and what remained missing were simply the definitions of "deadly or dangerous weapon" and "personal use." Given the court's general instruction that "[w]ords and phrases not specifically defined

---

[6]    "Some few objects, such as dirks and blackjacks, have been held to be deadly weapons as a matter of law; the ordinary use for which they are designed establishes their character as such. . . . [¶] Because a knife can be, and usually is, used for innocent purposes, it is not among the few objects that are inherently deadly weapons." (*People v. Aledamat* (2019) 8 Cal.5th 1, 6 (*Aledamat*).)

in these instructions are to be applied using their ordinary, everyday meanings," it stands to reason that the jurors reasonably believed they could apply ordinary, everyday meanings to these terms and that the failure to instruct on the meanings of "deadly or dangerous weapon" and "personal use" did not produce consequences that are unquantifiable and indeterminate.

The error here differs markedly from the types of constitutional violations that have been found to defy harmless error review, e.g., the complete deprivation of counsel, trial before a biased judge, racial discrimination in grand jury selection, or a defective reasonable doubt instruction. (*Neder*, *supra*, 527 U.S. at p. 8.) While undoubtedly serious, the error here is not a defect affecting the framework within which the trial proceeds, nor does the error "deprive" defendant of " 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair.' " (*Id.* at pp. 8–9.)

In so concluding, we note two further points. First, case law emphasizes that structural error is the exception not the rule, and there is a *strong* presumption—which applies here—that constitutional errors are subject to harmless-error analysis where a defendant was represented by counsel and tried by an impartial adjudicator. (*Merritt*, *supra*, 2 Cal.5th at p. 826.)

Second, case law authorizes us to "see what would be accomplished" by deeming the error in this case structural. (*Neder*, *supra*, 527 U.S. at p. 15.) As we discuss below, it was undisputed defendant used a knife to stab the victim 39 times, including in vulnerable parts of his body near vital organs, which resulted in the victim's death. This effectively means that defendant used the knife in "such a way that it is capable of causing and likely to cause

death or great bodily injury," thereby fitting the definitions of personal use and dangerous weapon. (*Aledamat*, *supra*, 8 Cal.5th at p. 6; see CALCRIM No. 3145.)

Having concluded the instructional error in this case is subject to harmless-error analysis, the question remains whether the error was harmless under *Chapman*, which asks "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' " (*Neder*, *supra*, 527 U.S. at p. 2715.) In conducting this analysis, we bear in mind that "[a]n instructional error involving multiple elements, like an error involving a single element, will be deemed harmless only in unusual circumstances, such as where each element was undisputed, the defense was not prevented from contesting any of the omitted elements, and overwhelming evidence supports the omitted element." (*Mil*, *supra*, 53 Cal.4th at p. 414.) We are persuaded that the requisite unusual circumstances exist in this case.

The evidence at trial, which included testimony from three eyewitnesses and defendant's own admissions, indisputably established that defendant personally stabbed the victim dozens of times, which was the basis for the murder and torture convictions. And there is no question that the knife he used to stab and kill the victim was a "dangerous weapon." (*Aledamat*, *supra*, 8 Cal.5th at p. 6; see CALCRIM No. 3145.) During closing argument, the prosecutor highlighted defendant's use of a knife to kill and torture the victim, and noted there was a special allegation regarding use of a knife. Meanwhile, defense counsel admitted defendant used a knife, though he argued the use was justified. Nothing prevented the defense from contesting defendant's use of a knife to commit the offenses. Had the court

31

properly instructed on the section 12022(b)(1) enhancement, we have no doubt the jury would have returned the same verdict that it did.

In sum, we reject defendant's claim of prejudicial instructional error concerning the section 12022(b)(1) enhancements. Nonetheless, we pause to highlight the following passage from a California Supreme Court opinion, which captures our sentiments here: "[T]his kind of error should never occur. One of the trial court's most basic duties is to instruct the jury on the elements of the crime. We assume the error here was solely due to inadvertence. No doubt the court intended to give the necessary instruction but somehow neglected to do so, and no one noticed. But a reviewing court should not have to go through this exercise. Certainly, a jury trial is a difficult undertaking. There is much to think about and much to do, often under considerable pressure. But the instructions are an important part of the process and care should be taken to ensure that they are correct and actually given. We also believe the prosecution bears responsibility for ensuring the jury is properly instructed. It is in its best interest to make sure the record does not contain obvious and serious error." (*Merritt*, *supra*, 2 Cal.5th at p. 833.)

### E. Exclusion of Evidence

At a pre-trial hearing, defendant joined Javier's motion to admit evidence of the victim's roughly 40 police contacts under Evidence Code section 1103. No corresponding written motion appears in the record, but the transcript of the hearing indicates the police contacts consisted of: a prior act of domestic violence against the victim's ex-girlfriend; crashing a car during a possible "DUI"; an iPhone theft not involving violence but where the victim worked with others; various acts of shoplifting and petty theft; an incident when the victim was found vomiting on himself at a BART station; the victim

pulling away from an officer causing them both to fall and the victim being arrested under section 148; an incident of vandalism, where the victim broke a sheet of glass at a BART station; a hit and run; and a number of acts of fare evasion. The court ultimately admitted the evidence that the victim hit his ex-girlfriend in 2014, but excluded the remaining police contacts because none involved violence and petty thefts were not relevant under Evidence Code section 1103.

Defendant now argues the trial court erred in excluding the evidence of the victim's prior misconduct. He does not identify which specific prior acts should have been admitted; instead, he contends generally that their exclusion allowed the victim to be portrayed in a false light. In his view, the victim's history of "explosive conduct" at public transit stations and incidents "fueled by alcohol" were relevant because the victim and his friend, Marcelus R., picked a fight with defendant near a bus stop, and the fatal confrontation occurred in front of a liquor store where the victim and Marcelus R. had been drinking and smoking. Defendant also contends the exclusion of such evidence was not justified under section 352.

We review evidentiary rulings for abuse of discretion. (*People v. Scott* (2011) 52 Cal.4th 452, 491.)

"No evidence is admissible except relevant evidence." (Evid. Code, § 350.) " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Evidence of a victim's character is admissible when offered by the defendant "to prove conduct of the victim in conformity with the character or trait of character." (*Id.* § 1103, subd. (a)(1).) Evidence Code section 352 permits the trial court to exclude

character evidence if in the court's discretion " 'its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' " (*People v. Shoemaker* (1982) 135 Cal.App.3d 442, 448.)

Here, defendant fails to show an abuse of discretion. For starters, he neglects to clearly identify all of the incidents at issue or discuss them in detail, and he fails to show relevance for a number of them. We surmise that defendant's theory of relevance for at least some of the misconduct seems to be that evidence of the victim's tendency to engage in theft and to drink alcohol would have supported his theory of self-defense that the victim instigated the confrontation. But under Evidence Code section 1103, character evidence is used to prove "conduct of the victim in conformity," and there was no evidence or even allegation that the victim tried to steal anything from defendant. Moreover, at the same pre-trial hearing, Javier noted there was a toxicology report showing that the victim's blood alcohol at the time of his killing was around 0.19%. A few days later, the trial court ruled the evidence of the victim's intoxication was admissible. Because the court knew there was alternative evidence of the victim's intoxication, we cannot say it was an abuse of discretion to exclude the remote and less probative evidence of the victim's prior acts.[7]

---

[7] Indeed, evidence was in fact introduced at trial that the victim's blood alcohol at the time of his killing was around 0.19% (the vitreous humor result was 0.23%) and that he had "THC" (a component of marijuana) in his system. Additionally, an expert testified about the possible "synergistic and enhanced" effect on the victim of contemporaneous alcohol and cannabis use. Because the jury heard direct evidence of the victim's intoxication and its possible effect during the incident, any error in excluding evidence concerning the victim's tendency to drink alcohol was harmless.

Moreover, the defense was permitted to introduce evidence, primarily through defendant's testimony, that Marcelus R. (and to a lesser degree, the victim) instigated the first fight. But as the prosecutor argued during closing argument, even if one credited defendant's story that the victim and Marcelus R. instigated a fight when defendant got off the bus, and even if one believed defendant's story that the victim instigated the second fight when defendant later confronted them in front of the liquor store, this could not have justified defendant's brutal attack.

In short, defendant fails to show the trial court abused its discretion—prejudicially or otherwise—in excluding the evidence of the victim's prior misconduct.

**DISPOSITION**

The judgment is affirmed.

_____
Fujisaki, Acting P.J.

WE CONCUR:

_____
Petrou, J.

_____
Rodríguez, J.

*People v. Gutierrez-Corral* (A168063)

35